**In re STABLE MEWS ASSOCIATES, INC., Debtor.**

**Bankruptcy No. 82–B–12454.**

United States Bankruptcy Court, S.D. New York.

July 11, 1984.

Albert Togut, New York City, Chapter 11 Trustee; Kenneth Coleman, New York City, of counsel.

Fischbein, Olivieri, Orzenholc & Badillo, New York City for various tenants; Robert Chira, New York City, of counsel.

Raymond Aab, New York City, for R. Fiske Whitney.

## MEMORANDUM AND DECISION

HOWARD C. BUSCHMAN III, Bankruptcy Judge.

This case presents the issue of whether an operating trustee for a debtor-in-possession may reject leases of tenants and thereby be relieved of the contractual obligation to service a building that is property of the estate notwithstanding the requirements of local laws that landlords provide essential services.

### I

The Chapter 11 Trustee of the estate of Stable Mews Associates, Inc. ("Trustee") moves, pursuant to § 365(a) of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 365(a) (the "Code"), to reject the unexpired leases between the debtor as lessor and the five tenants currently occupying the debtor's building at 412–414 East 75th Street in New York City, ("Tenants").[1] By so doing, he seeks to discontinue providing essential services to the building. Under § 365(a) of the Code, the Trustee is empowered, subject to court approval, to assume or reject executory contracts, such as unexpired leases of the debtor. Given that the Code, like the Bankruptcy Act of 1898 (11 U.S.C. § 110a(5) (1938) (repealed) before it, provides no guidance as to the standards to be applied by the court in evaluating the rejection of an unexpired lease, two diver-

---

1. A more complete statement of facts and background is reported in *In re Stable Mews Associ-* *ates, Inc.,* 35 B.R. 603 (Bkrtcy.S.D.N.Y.1983), familiarity with which is assumed.

gent standards have evolved: the burdensome property test and the business judgment test.

Under the burdensome property test, an executory contract can be repealed only when continued performance under the contract results in an actual loss to the estate. *American Brake Shoe & Foundry Co. v. New York Rys. Co.*, 278 F. 842 (S.D.N.Y.1922); *In re Vidicom Systems, Inc.*, 2 B.C.D. 2 (Bankr.S.D.N.Y.1975). Under this standard, a trustee must demonstrate that income generated under the leases fails to cover the operating expenses of the building. *In re Chicago Rapid Transit Co.*, 129 F.2d 1 (7th Cir.1942).

The business judgment test provides considerably more flexibility to a trustee. It requires only that the trustee demonstrate that rejection of the executory contract will benefit the estate. *Matter of Minges*, 602 F.2d 38 (2d Cir.1979); *Local Joint Executive Board, AFL–CIO v. Hotel Circle, Inc.*, 419 F.Supp. 778 (S.D.Cal.1976), *aff'd.*, 613 F.2d 210 (9th Cir.1980); The primary element of such a showing is the extent to which a rejection will benefit the general unsecured creditors of the estate. This may involve a balancing of interests. *In re Chi-Feng Huang*, 23 B.R. 798, 9 B.C.D. 972, 7 C.B.C.2d 639 (Bkrtcy.App. 9th Cir. 1982). As the Second Circuit has stated: "[T]he trustee and ultimately the court, must exercise their discretion fairly in the interests of all who have had the misfortune of dealing with the debtor." *Matter of Minges*, 602 F.2d at 43.

The great weight of modern authority applies the business judgment test. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co.*, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943); *Matter of Minges*, 602 F.2d 38 (2d Cir. 1979); *Matter of Tilco*, 558 F.2d 1369, 1372 (10th Cir.1977); *King v. Baer*, 482 F.2d 552, 557 (10th Cir.), *cert. denied*, 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973).

Indeed, virtually all recent Bankruptcy Court decisions apply this test. *See, e.g., In re Chi-Feng Huang*, 23 B.R. 798, 800, 9 B.C.D. 972, 7 C.B.C.2d 639 (Bkrtcy.App. 9th Cir.1982); *In re Roman Crest Fruit, Inc.*, 35 B.R. 939, 948–49 (Bkrtcy.S.D.N.Y.1983); *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104 (Bkrtcy.S.D.N.Y.1982); *In re National Sugar Refining Co.*, 21 B.R. 196 (Bkrtcy.S.D.N.Y.1982); *In re Sombrero Reef Club, Inc.*, 18 B.R. 612, 8 B.C.D. 1277, 6 C.B.C.2d 506 (Bkrtcy.S.D.Fla.1982); *In re International Coins & Currency*, 18 B.R. 335, 6 C.B.C.2d 309 (Bkrtcy.D.Vt.1982); *In re Marina Enterprises, Inc.*, 14 B.R. 327, 8 B.C.D. 59, 5 C.B.C.2d 434 (Bkrtcy.S.D.Fla. 1981); *In re Lafayette Radio Electronics Corp.*, 8 B.R. 528, 533, 3 C.B.C.2d 804 (Bkrtcy.E.D.N.Y.1981); *In re J.H. Land & Cattle Co., Inc.*, 8 B.R. 237, 238, 7 B.C.D. 228, 3 C.B.C.2d 695 (Bkrtcy.W.D.Okl.1981); *In re Hurricane Elkhorn Coal Corp. II*, 15 B.R. 987, 989 (Bkrtcy.W.D.Ky.1981); *In re Summit Land Co.*, 13 B.R. 310, 314, 7 B.C.D. 1361 (Bkrtcy.Utah 1981). The Supreme Court apparently accepted the business judgment test in *National Labor Relations Board v. Bildisco & Bildisco*, —— U.S. ——, 104 S.Ct. 1188, 1195, 79 L.Ed.2d 482 (1984) terming that standard "traditional."

## II

Nevertheless, *Bildisco* itself poses the issue of whether "a somewhat stricter standard" (104 S.Ct. at 1195) should apply to a lessor's rejection of residential or commercial leases where the effect sought would be to relieve the trustee of the contractual obligation to provide essential services that are also mandated by local law.

■ Nothing in § 365 of the Code, however, indicates that Congress desired the application of a stricter test. The structure of § 365 of the Code, particularly in its inclusion of § 365(h),[2] counsels against the

---

**2.** Section 365(h) provides:

(1) If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, the lessee under such lease may treat the lease as terminated by such rejection, or, in the alternative, may remain in possession for the balance of the term of such lease and any renewal or extension of

application of such a test. It indicates that Congress expected the test of rejection by a lessor to be that applicable to other executory contracts. It further indicates that Congress carefully considered the variant cases decided under the Bankruptcy Act and drafted that section in order to afford tenants with appropriate balancing protections. *In re Stable Mews, Inc.*, 35 B.R. 603, 604 (Bkrtcy.S.D.N.Y.1983).

■ Thus, in § 365(h)(2) Congress enabled a trustee to reject an undesirable lease regardless of the condition of the premises at the time of rejection, *In re Acme Precision Building, Ltd.*, 23 B.R. 79 (Bkrtcy.S.D.Ohio 1982), thereby relieving the estate from covenants requiring future performance, such as the provision of utilities, repairs, maintenance and janitorial services by the debtor. *In re LHD Realty Corp.*, 20 B.R. 717, 719, 9 B.C.D. 361 (Bkrtcy.S.D.Ind.1982).

■ Similarly, Congress protected tenants by giving them the option to treat the lease as terminated by the rejection, and to assert general claims against the estate, H.Rep. No. 95–595, p. 349, U.S.Code Cong. & Admin.News 1978, p. 5787, Sen.Rep. No. 95–989, p. 60, U.S.Code Cong. & Admin. News, 1978, p. 5846, or to retain possession for the balance of the term. If a tenant remains in possession, the rent owed is that reserved in the lease less any damages caused by non-performance of the lessor's obligations after rejection. *In re Stable Mews Associates, Inc.*, 35 B.R. 603 (Bkrtcy. S.D.N.Y.1983).

In contrast, The Administrative Code of the City of New York, Title D ("The Housing Maintenance Code"), Subtitle II, Articles 10–22 (1967) requires owners of multiple dwelling units to keep the premises in good repair, properly maintain and keep in good repair the plumbing and drainage systems, provide heat and hot water, provide electric lighting fixtures for public areas, and provide adequate janitorial services. But, in addition to being able to compel performance of that obligation, tenants of such premises may treat a lease as terminated upon its breach, *Mayers v. Kugelman*, 81 Misc.2d 998, 367 N.Y.S.2d 144 (3d Dist.Ct. Suffolk Co. 1975) or obtain the required services not provided by a landlord, and set off their cost against the rent reserved in the lease. *See, e.g., Katurah Corp. v. Wells*, 115 Misc.2d 16, 454 N.Y. S.2d 770 (Sup.Ct.App. Term 1st Dept.1982) (necessary repairs); *Garcia v. Freeland Realty Co.*, 63 Misc.2d 937, 314 N.Y.S.2d 215 (N.Y.C.Civ.Ct.N.Y.County 1970) (urgently needed repairs); *J.T.L. Associates v. Fred*, 112 Misc.2d 742, 447 N.Y.S.2d 337 (N.Y.C.Civ.Ct. Queens County 1981) (repair of broken locks); *Jackson v. Rivera*, 65 Misc.2d 468, 318 N.Y.S.2d 7 (N.Y.C.Civ.Ct. N.Y.County 1971) (repair broken toilet). A tenant may also contract and pay for delivery of heating oil and utilities upon the landlord's failure to do so, and deduct any payments from the rent reserved in the lease. N.Y. Multiple Dwelling Law § 302–c (1982), N.Y.Real Property Law § 235–a(1) (1972).

■ These remedies, consistent with those provided by Congress, show that the exact nature of the statutory inconsistency lies in the Code's enabling a trustee to avoid *further* obligation rather than totally negate health and safety ordinances of particularly local concerns. Freeing an estate from further contractual obligations, the rejection of which, in the business judgment of the trustee, will benefit the estate and its creditors, is a hallmark of the twin federal goals of rehabilitation and maximization of the estate for the benefit of creditors. State and Local laws that stand "as an obstacle to the accomplishment and exe-

---

such term that is enforceable by such lessee under applicable non-bankruptcy law.

(2) If such lessee remains in possession, such lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease, and any such renewal or extension, any dam-

ages occurring after such date caused by the nonperformance of any obligation of the debtor after such date, but such lessee does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset.

cution of the full purposes of Congress" under the Supremacy Clause (Art. VI, Cl. 2 U.S. Const.) are preempted. *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). Even though such laws and ordinances may otherwise be valid as an exercise of the state's police power and carry a heavy presumption against preemption, *A Framework for Preemption Analysis*, 88 Yale L.J. 363, 380–381 (1978), they must yield if they conflict with the bankruptcy laws. *Perez v. Campbell*, 402 U.S. at 649, 91 S.Ct. at 1711; *Johnson v. First National Bank of Montevideo, Minnesota*, 719 F.2d 270, 273 (8th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); *In re Gunder*, 8 B.R. 390, 392 (Bkrtcy.S.D.Ohio 1980); *In re Erlin Manor Nursing Home, Inc.*, 36 B.R. 672, [CCH] B.L.D. ¶ 69,706, p. 84,314 (1984); *Matter of Bohack Corp.*, 2 B.C.D. 1740, 1742 (Bankr. E.D.N.Y.1977).

These considerations all support the notion that § 365, standing alone, is to be interpreted in accord with its plain language: Congress adopted a uniform test; because it was concerned for the effects of rejection on lessees of real property, it, rather than codify a variation in the test, limited the effects of rejection to supply the protection desired.

### III

But § 365 does not stand alone. It is part of a comprehensive enactment of which 28 U.S.C. § 959(b) is a part. That section requires a trustee to comply with state law in managing a debtor's property. Accordingly, the tenants assert that the power to reject leases must be so constricted and the trustee disabled from rejecting those lease covenants obligating him to

provide heat, hot water, electricity, janitorial services and the like.

This argument has initial surface appeal. The provisions of § 959(b) apply to municipal ordinances as well as state law. *Finn v. 415 Fifth Avenue Co.*, 153 F.2d 501 (2d Cir.1946). But *Finn*, on which the tenants rely, hardly touches on the issue of whether Congress intended § 959(b) to so limit § 365.[3] The court there made no suggestion that a debtor-lessor must continue to provide services to tenants after rejection of their leases. We thus turn to examination of 28 U.S.C. § 959(b) itself and its purpose as part of the comprehensive set of amendments enacted as part of the Bankruptcy Reform Act of 1978.

Section 959(b) provides:

"Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."

General in nature, this statute imposes on the Trustee a broad obligation to comply with state law, without enumerating any specific responsibilities. Amended and re-enacted as part of the Bankruptcy Reform Act of 1978, § 959(b) clearly embodies a Congressional intention to prevent bankruptcy trustees from using the authority of the federal courts to immunize themselves from state regulation of their business operations. *See Palmer v. Webster & Atlas Nat'l Bank of Boston*, 312 U.S. 156, 163, 61 S.Ct. 542, 545, 85 L.Ed. 642 (1941). The reason for such a policy is apparent: An ongoing business should not receive unfair

---

**3.** In *Finn*, the Chapter 11 trustee of a debtor-lessee sought to remain in possession of the subject premises by invoking the New York Rent Control Law, which authorized lessees to remain in possession during a specified emergency period. The Second Circuit upheld his right to possession, notwithstanding a prior bankruptcy court

adjudication that the leases had already expired. In citing 28 U.S.C. (1940 Ed.) § 124, the predecessor statute to § 959(b), the court merely stated that the trustee, who was bound to conform to the Rent Control Law, might also invoke its benefits. The lease remained rejected.

competitive advantages merely because it seeks to reorganize itself under Chapter 11 of the Bankruptcy Code. *See Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Palmer v. Webster & Atlas Nat'l. Bank of Boston,* 312 U.S. at 163, 61 S.Ct. at 545.

█ In contrast stand the united embrace of § 365 of the Code, the clear authorization of rejection § 365(g) and the creation in § 365(h) of a remedy for tenants. Those sections codify a delicate balance between the rights of a debtor-lessor and the rights of its tenants. A trustee may avoid undesirable leases, but may not deprive tenants of possession, and must allow them to pay for essential services with the rents reserved in their leases. *In re Stable Mews,* 35 B.R. 603 (Bkrtcy.S.D.N.Y.1983).

█ As such, this comprehensive enactment, like so many others, reflects, in Judge Learned Hand's felicitious phrase, a "proliferation of purpose", Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527, 529 (1947). In this exercise of interpretation, each section is to be read in light of others, to preserve an overall sense and design, *see Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981), having in mind the policies sought to be achieved. *See, Blue Chip Stamps v. Manor Drug Stores Inc.,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In the achieving of this goal is applicable the familiar canon that specific legislation governs the general regardless of temporal sequences, *Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980), it being presumed that Congress intended it as an exception to legislation of more general application. *Gusan Restaurant Corp. v. Specinner,* slip. op. 4573, 4579, n. 3 (2d Cir. June 18, 1984); *Chemical Manufacturers Ass'n v. Environmental Protection Agency,* 673 F.2d 507 (D.C.Cir.1982); *Stewart v. Smith,* 673 F.2d 485 (D.C.Cir.1982).

Indeed, the predecessor to § 959(b) was understood to yield where the provisions of local law said to be applicable "conflict with the Constitution or laws of the United States." *Gillis v. California,* 293 U.S. 62, 65, 55 S.Ct. 4, 5, 79 L.Ed. 199 (1934). Such a case was *Palmer v. Webster & Atlas National Bank of Boston,* 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 642 (1941), involving a conflict far less direct than that of § 365 and the Housing Maintenance Code. There a trustee of a railroad in reorganization who had rejected a lease covering a railroad, was compelled pursuant to § 77(c)(6) of the Bankruptcy Act to continue to operate the line in the public interest. In rejecting the lease, the trustee sought, *inter alia,* to avoid paying its share of fees required by state statute to defray the expenses of a state terminal company organized to operate terminal and station facilities attributable to the leased line. The court held that § 65 of the Judicial Code, the predecessor to 28 U.S.C. § 959(b), in its seeming mandate of compliance with state law, did not so require. It reasoned that the effect would be to prefer the creditors of the lessor line, also in reorganization, over the creditors of the lessee line which was operating the property involuntarily in order that public service not be disrupted. Accordingly the court observed: "We think that to state the proposition is to demonstrate that § 65 of the Judicial Code has no such purpose or effect." 312 U.S. at 167, 61 S.Ct. at 547.

The same reasoning applies here. The Housing Maintenance Code conflicts with express statutory policy codified in § 365(h) of the Code. The claims of lessees for damages due to rejection of their leases, are unsecured except that lessees can set off their damages up to the amount of the rent. To require the Trustee, nevertheless, to provide services creates a disparity similar to that in *Palmer* and thus not within the intendment of 28 U.S.C. § 959(b).

Moreover, the parallel nature of the remedies of setoff provided to tenants by § 365(h) and state law for a lessor's discontinuation of services indicates that the Trustee's rejection of leases puts him in no significantly improved competitive position *vis a vis* non-bankrupt landlords especially in this city where tenant organization and

rent strikes are not uncommon. The purpose sought to be achieved by § 959(b) is, therefore, not disrupted. To be sure, the Trustee may be freed, through rejection, of potentially being subject to a decree of specific performance of the obligation. But it is that obligation that would result in the same inequity held by the *Palmer* court not to be intended by Congress.

■ None of this is to say that a local government in the exercise of its regulatory authority and police power may not enforce that authority under § 362(a) of the Code. *See, Matter of Kennise Diversified Corp.*, 34 B.R. 237, 11 B.C.D. 189, 9 C.B.C.2d 778 (Bkrtcy.S.D.N.Y.1983). It is to say that reading these statutes together in the light of extant authority compels the conclusion that Congress, in balancing the rights of debtor-in-possession landlords with those of tenants through § 365(h) of the Code, did not intend for that balance to be disturbed by the general prohibitions of 28 U.S.C. § 959(b). Particularly is this so in this case where the general policy of permitting trustees to rid themselves of further executory obligations has been long engrained in bankruptcy law and policy and, most importantly, where the policy of even competition sought to be advanced by the general prohibition will not be markedly disturbed. The business judgment test of § 365 thus applies.

## IV

■ In the application of that test to the evidence adduced at the hearing, it is clear that the trustee's exercise of his business judgment to reject the leases should be sustained. Two principal reasons in support of his business judgment are advanced by the Trustee: the cost of continued maintenance and repair of the building and its equipment and the benefit to the estate from the sale of the building without the burden of the Tenant's leases.

As might be expected, the parties maintain varying perceptions of the state of the premises, particularly of the condition of the building's heating unit. The independent managing agent of the building is of the firm conviction, based upon cost of operation and inspections, that the heating system cannot be properly maintained, that it is not operating efficiently, and that it will likely have to be replaced at a cost of between $30,000.00 and $60,000.00. The building's former owner, who also holds a first mortgage upon which he, in this Court, has sought permission to foreclose, testified, however, that he installed the heating system, resheeted it in 1980, and believes it has a useful life of another 30 years. One of the tenants nevertheless, testified that the heating system breaks down "quite frequently."

Clearly, some questions exist as to the viability of the unit. The testimony of the managing agent, however, was far more credible than that of the former owner. The Trustee's refusal, in his business judgment, to rely on the assurances of the former owner as to the system's likelihood of future performance, is amply supported, especially where assurances are given by one who, if the Trustee's efforts to sell the building free of the leases fails, stands to gain upon the failure of this Chapter 11 case and his foreclosure of his mortgage.

The parties also differ with respect to the benefits to be realized upon the alternative courses of action available to the Trustee: sale of the building or its continued operation.

The Tenants concede that a sale of the premises at a price equal to the offer generated by the debtor-in-possession prior to the appointment of the trustee will yield at least $90,000.00 to unsecured creditors. They aver that this is "not a significant benefit" and argue that the Trustee could raise more cash by leasing the remainder of the building, instead of seeking to vacate it for sale to the highest bidder. But such a matter falls squarely within the business judgment of the Trustee. The business judgment test leaves no room for

speculation as to which business choice will yield the greater return, once it has been shown that the Trustee's choice will benefit the estate and unsecured creditors. *Matter of Minges*, 602 F.2d at 38.

Here, the attainment of the Trustee's avowed objective of selling the premises vacant will apparently provide a net benefit of $90,000,000 to unsecured creditors. While the offer leading to that result has lapsed, it seems to provide an appropriate benchmark for the exercise of the Trustee's business judgment. Should the Tenants avail themselves of the opportunity provided in § 365(h) of the Code to remain in possession of the leased premises, the Trustee will still be freed of the leases and the concomitant expenses required to manage the building, as well as saving potentially large infusions of cash for repairs for the benefit of the estate. Additionally, by not locking the estate into a long-term commitment to manage the building, the Trustee leaves the estate the future option of selling the premises at the conclusion of the tenants' leases and renewal terms when their right to possession under § 365(h) will come to an end.

Forcing the Trustee to engage in a venture he considers unwise, by mandating an assumption of the unexpired leases on the theory that speculative profits may exist, runs contrary to the clear intention of the Code, which provides in § 1108 that the Trustee may operate the debtor's business. This Court should not substitute its business judgment for that of the Trustee. Where there is no reason to doubt that the Trustee's decision was made in good faith and his judgment that the estate will be benefitted is cogently supported, that decision should stand. In this case, no such reason exists.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The motion by the Trustee should be granted.

Settle Order on Notice.