**In re UPLAND/EUCLID, LTD., a California partnership, Debtor.**

**UPLAND/EUCLID, LTD., Appellant,**

**v.**

**GRACE RESTAURANT CO., Appellee.**

**Bankruptcy No. LA 84–13891–BR.**
**BAP No. CC–85–1005–AbMV.**

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued March 21, 1985.
Decided Oct. 11, 1985.

McCutchen, Black, Verleger & Shea, Roger A. Ferree, Diane C. Stanfield, Los Angeles, Cal., for appellant.

Rutan & Tucker, Robert W. Alberts, David Ray Jenkins, Costa Mesa, Cal., for appellee.

Before ABRAHAMS, MEYERS and VOLINN, Bankruptcy Judges.

ABRAHAMS, Bankruptcy Judge.

The debtor/lessor appeals from an order denying its motion to reject an unexpired lease of real property and to set a reasonable rent for the remainder of the lease term. We affirm.

## FACTS

In 1976, appellant Upland/Euclid, Ltd. leased real property to appellee Grace Restaurant Company for twenty-five years, with options to extend the term for an additional fifteen years. The annual rent reserved in the lease is the greater of $51,256.92 or five percent of the restaurant's gross income.

Upland, as debtor-in-possession, moved to reject the unexpired lease under 11 U.S.C. § 365(a) and to set a reasonable future rent for the premises. Upland contended, and we will assume, that a current "reasonable rent" would be more than the rent under the lease. The bankruptcy judge denied the motion to modify the rent. He then suggested that Upland withdraw the motion to reject the lease. Upland followed this suggestion, because any attempt to reject the lease would be futile if the rent could not be raised. We treat this as denying Upland's motion to reject the lease.[1]

## DISCUSSION

When a debtor/lessor rejects a lease of real property, the lessee has a choice under 11 U.S.C. § 365(h)(1):

[T]he lessee under such lease may treat the lease as terminated by such rejection, or, in the alternative, may remain in possession for the balance of the term of such lease and any renewal or extension of such term that is enforceable by such lessee under applicable nonbankruptcy law.[2]

Here, because the lessee indicated that it would elect to remain in possession, 11 U.S.C. § 365(h)(2) applies:

Bankruptcy Code enables it to do so. Grace desires that the rent remain unchanged and argues that the Bankruptcy Code justifies its position. Both positions have been argued vigorously on appeal. We do not doubt that a live controversy exists here and that the matter can be conclusively resolved. The dissent, however, would require the bankruptcy judge to decide the rejection issue—as to which there is presently no controversy—simply to preserve the rent issue for appeal. Under the dissent's approach, we expect the following would happen: Upland will renew its motion to reject the lease, the bankruptcy judge will deny the motion, Upland will appeal, and the matter will be back before us, exactly as it is now except for some additional delay and expense.

---

1. Whether a lease should be rejected is a matter for the debtor's business judgment, *In re Chi-Feng Huang*, 23 B.R. 798 (Bankr.9th Cir.1982). Here, if the rent could not be changed, there would be no business reason to reject the lease. Rather than wasting the time of the court and the parties by pressing a motion that would obviously be denied, Upland appealed the denial of its motion to modify the rent. If Upland were successful on this appeal, it could have renewed the motion to reject the lease. 11 U.S.C. § 365(d)(2) (lease may be rejected "at any time before the confirmation of a plan"). To be a proper matter for us to resolve, an appeal must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted). Here, Upland desires to increase the rent and argues that the

2. Upland filed this case under chapter 11 on June 28, 1984. The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, made several alterations to section 365(h) which do not affect our decision. The nondebtor lessee's rights both before and after the amendments are identical.

If such lessee remains in possession, such lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and any such renewal or extension, any damages occurring after such date caused by the nonperformance of any obligation of the debtor after such date, but such lessee does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset.

The issue here is whether section 365(h)(2) allows the bankruptcy court to change the rent set by the rejected lease if the debtor/lessor rejects an unexpired lease of real property and the lessee elects to remain in possession.

## I.

Appellant contends that the reason for permitting debtors to assume or reject leases and executory contracts is to increase the estate funds available for payment of creditors. If the rent paid by a lessee of real property were to increase, the distribution to creditors would also increase. Therefore, appellant reasons that the bankruptcy judge must set the rent at the higher market rate.

We disagree. To us, section 365(h)(2) permits only a limited rejection by lessors. The debtor/lessor may reject a lease, provide no more services, and stop the flow of funds benefitting the lessee but cannot deprive the lessee of its possessory property interest in the leased premises. As a balance to allowing continued possession by the lessee, section 365(h)(2) limits the lessee's remedy for loss of services to an offset against the rent under the rejected lease.

The statute's phrase "offset against the rent reserved" implies that the rent under the lease continues. It makes no sense to apply the offset against the reserved rent

if that rent is not charged. If the offset could be against a modified rent, the section would have stated that the offset is against "the rent that would otherwise be due," "the reasonable rental value of the property," or simply "the rent," not "the rent reserved under such lease."

Appellant's position finds no support in the legislative history of the subsection. The House and Senate committee reports restate and slightly amplify the provisions of the section without saying that the rent can be modified by a debtor/lessor. H.R. Rep. No. 595, 95th Cong., 1st Sess. 349 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 60 (1978), U.S.Code Cong. & Admin.News 1978, 5787.

## II.

Our conclusion is in accord with *In re Stable Mews Associates,* 35 B.R. 603 (Bankr.S.D.N.Y.1983). There, the lessor's bankruptcy trustee rejected leases of real property and sought to compel the lessees to pay a market rate more than five times the rent under the lease. The court analyzed section 365(h) against the history of the related provision of the former Bankruptcy Act protecting the tenant's "estate."[3] The court observed that Congress was aware of the confusion as to possession and liability for rent generated by previous cases and addressed the matter in section 365(h). Therefore, the plain meaning of the statute controlled. Although the lessor could reject the lease and stop providing services, the lessees could not be compelled to pay more than the rent reserved in the lease less any offset allowed by section 365(h)(2).

## III.

Our holding is consistent with other portions of the Bankruptcy Code. Subsection 365(h) parallels subsection 365(i). Upon rejection of real estate sales contracts by a debtor/seller, section 365(i)(1) allows the

---

3. Section 70(b) of the former Bankruptcy Act provided in part: "The trustee shall assume or reject an executory contract, including an unexpired lease of real property.... Unless a lease of real property expressly provides, a rejection of the lease or of any covenant therein by the trustee of the lessor does not deprive the lessee of his estate."

purchaser in possession either (1) to treat such contract as terminated, surrender possession, and receive a general claim against the estate, or (2) to remain in possession. The Code goes on to provide:

[I]f such purchaser remains in possession ... such purchaser shall continue to make all payments due under such contract, but may, offset against such payments any damages occurring after the date of the rejection of such contract caused by the nonperformance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after the date of such rejection, other than such offset....

11 U.S.C. § 365(i)(2). By requiring the purchaser to continue making the payments under the original contract—a contract rejected by the debtor—Congress clearly intended that the debtor/seller could not increase the purchase price.

The similarities between subsections 365(h) and (i) are obvious. In each instance, one with real property rights is given an option to continue an "estate" and to offset the damages arising from the loss of benefits promised by the debtor. The offset cannot exceed the amount due under the lease or purchase contract. The only difference between the subsections is that purchasers are expressly required to make all payments due under the contract, while the similar requirement as to lessees is implicit from the reference to the "rent reserved." Both subsections show a legislative intention that certain expectations of parties to real property transactions are to be protected although this protection does not benefit the bankruptcy estate.[4] Any general goal of maximizing the bankruptcy estate is limited in recognition of these real property interests. *Collier* summarized this limitation as follows:

The desire to effect a feasible plan of reorganization cannot override the vested rights of third persons who are not creditors of the debtor. Insofar as the lessee's leasehold is concerned he is as much a stranger to the reorganization as one who purchased, received and paid for goods of the debtor prior to reorganization.

6 *Collier on Bankruptcy* ¶ 3.24, at 602–03 (14th ed.1977).

## IV.

Appellant relies upon *In re Schnabel*, 612 F.2d 315 (7th Cir.1980), a case construing section 70(b) of the former Bankruptcy Act. In *Schnabel* the tenant remained in possession after the bankruptcy but did not pay the rent. The lessor's trustee rejected the lease and the tenant later vacated the premises. When the trustee sued for the rent, the tenant responded that rejection cancelled all contractual relations between the parties, including the duty to pay rent. The court disagreed, holding that "the trustee may charge and recover *a reasonable rental* for the demised premises until the end of the term," *citing* 4A *Collier on Bankruptcy* ¶ 70.44, at 541 n. 6 (14th ed. 1967) (*quoting In re Freeman*, 49 F.Supp. 163, 165 (S.D.Ga.1943)) (emphasis added).

We find *Schnabel* unpersuasive here for three reasons. First, the Bankruptcy Act had no provision comparable to the present 11 U.S.C. § 365(h)(2). Second, it is doubtful that our question as to the effect of the rent reserved was before the court. Third, any reliance on *Collier* and *Freeman* was misplaced.

*Schnabel* held that "if the tenant [remaining in possession] is injured by the modification of his rights he is deemed a creditor and has a remedy against the bankrupt." 612 F.2d at 317 n. 2. But, under section 365(h)(2), a tenant remaining after rejection has *no* rights against the estate as a creditor except the offset.

The tenant's primary contention in *Schnabel* was that no rent whatsoever was owed because the lessor failed to accept the

---

4. Subsections 365(h) and (i) were amended in 1984 to apply this same legislative intention to

timeshare transactions also.

lease. The tenant, the trustee, and the court assumed that if anything was owed, it was the fair rental value.[5] Because the tenant introduced no evidence as to the fair value, the bankruptcy judge ruled that the fair rent was equal to the lease rent. Thus, the tenant would have paid the same amount whether the court awarded the reserved rent or the fair rental value.

*In re Freeman*, 49 F.Supp. 163 (S.D.Ga. 1943), cited by *Schnabel* as a basis for the view of *Collier*, was a case under Chapter XII of the Bankruptcy Act. The leased property was a house subject to a mortgage. The bankruptcy estate would realize nothing if the house were sold at a mortgage foreclosure sale. In contrast, a private buyer was willing to pay enough to provide the estate with some equity but only if he could have immediate possession. The trustee rejected the lease and evicted the tenant. On review, the district court held that rejection of the lease created a tenancy at sufferance, the trustee could collect a reasonable rent from the tenant because the rental contract no longer bound the parties, and the tenant's remedy for loss of the leasehold estate was a claim against the bankruptcy estate for money damages.

*Freeman's* characterization of the tenancy under a rejected lease as one at sufferance was later disapproved by its circuit as contrary to the clear language of the statute in *Matter of Garfinkle*, 577 F.2d 901, 904 n. 4 (5th Cir.1978); *cf.* Creedon & Zinman, *Landlord's Bankruptcy: Laissez les Lessees*, 24 Bus.Law. 1391, 1431–32 (1971). The decision is criticized by a different part of the *Collier* treatise, the same work on which the *Schnabel* court relied:

> The [*Freeman*] court ... overlooked the fact that there is nothing in the Act giving the trustee or debtor in possession the right to disaffirm an executed per-

formance, and that the lessee has a vested estate that is distinct from the executory covenant contained in the lease. ...
> The *Freeman* case, therefore, does not represent the proper view of the effect of rejection of an unexpired lease by the debtor-landlord.

> 6 *Collier on Bankruptcy* ¶ 3.24, at 602–03 (14th ed. 1977). Also, as discussed above, the *Freeman* remedy, a claim for damages against the estate, is now unavailable to a lessee in possession because of section 365(h)(2).

## V.

Appellant would charge the market rent to prevent a lessee from obtaining what the appellant characterizes as an unfair windfall. The "windfall" results from paying the rent upon which the parties had earlier agreed. Presumably, the parties took the risk of market fluctuations into account when they set the rent.

Were we to adopt appellant's view, the windfall might go to the lessor. The parties may not have apportioned the lessee's costs evenly throughout the term of the lease. For example, a tenant may make a large initial payment and then pay a relatively small rent for the remainder of the term. Another tenant may lease bare ground from a debtor and then construct the buildings on that ground. These tenants would be severely harmed by setting the remaining rent at the market rate unless the court amortized the initial payment or the cost of the building over the life of the lease. Appellant's rationale, however, suggests that past payments be ignored if to consider them would reduce the benefit to the estate from increased rent.

At oral argument, appellant suggested that adjustments could be made in the individual case. In effect, the courts would have to adjust "fair rental value" by con-

---

5. *Schnabel* may have assumed without discussion that the tenant had also terminated the lease. The tenant not only failed to pay the rent due under the lease but also vacated the premises before the end of the term. If both tenant and trustee considered the lease to be abrogated, then the tenant would have been a tenant at will and the trustee could have sought the fair rental value. The bankruptcy judge held the tenant liable for rent only during the actual occupancy, not the entire term. This is consistent with mutual termination of the lease and inconsistent with the tenant's affirmation of his leasehold estate.

cepts of "fairness to the tenant." Instead of this extra procedure that is not mentioned in the statute, we think it best to recognize the obvious: the simplest and fairest approach is, as Congress obviously intended, to protect the lessee by not allowing an increase in the rent.

## CONCLUSION

We hold that section 365(h) recognizes that the nondebtor lessee has an estate in the real property. The section interferes with that estate only by allowing the debtor to eliminate services to the tenant and not by allowing an increase in rent.

The bankruptcy judge's order is AFFIRMED.

VOLINN, Bankruptcy Judge, dissenting:

The majority ruling significantly affects issues relating to leases in bankruptcy cases. Because the grounds for this ruling are jurisdictionally and procedurally questionable, I am constrained to dissent.

## I. PROCEDURAL CONTEXT

Contrary to the majority's premise of denial of the motion to reject, the court below neither granted nor denied Upland's motion to reject the unexpired lease. The court stated, during argument, that *if* the lease were rejected, Upland would be unable to increase the rent. Thereupon Upland's counsel conceded that "The sole purpose of rejecting was to increase the rent" and orally moved, on the court's invitation, to withdraw the motion to reject. That motion was granted in open court and, subsequently, in the order appealed from.

Consequently, this appeal is in an awkward posture. While the motion ostensibly articulated dual purposes of rejecting the unexpired lease *and* having the court set a reasonable rental, these two objectives are intertwined since rejection of the lease was to be accomplished by raising the rent. Therefore, withdrawal of the motion to reject was equivalent to withdrawal of the application to increase the rent. Under these circumstances, the ruling of the court below as to rent, or any aspect of rejection, could only be advisory.

"[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." *Flast v. Cohen,* 392 U.S. 83, 96, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968), quoting from C. Wright, Federal Courts 34 (1963). *See also In re Davis,* 23 B.R. 773, 777 (Bankr.App.9th Cir.1982). The source of the prohibition against advisory opinions is the "cases" and "controversies" requirement of Article III of the U.S. Constitution and the constitutional doctrine of separation of powers. 13 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3529.1 at 293–95 (2d ed.1984). This principle which is applicable to Article III courts would apply with at least equal force to bankruptcy courts, which are units of district courts. *See In re Burckardt,* 8 B.R. 327, 330 (Bankr.D.Puerto Rico 1980); 28 U.S.C. § 151.

The majority insists that the withdrawn motion rendering the matter moot should not be considered withdrawn because *Upland* will without question file such a motion again and that any court considering such a motion will without question deny it. Considering the capacity of litigants and counsel for ingenuity in adapting to changed circumstances, this double prophecy is at best an educated guess.

## II. FACTUAL BACKGROUND

The subject property, a restaurant building, is the only asset of Upland, the debtor-lessor. Upland is indebted to the lessee, Grace, which is a secured creditor holding a trust deed on the subject property to secure approximately $625,000 of debt. The only other debt listed on the debtor's schedules is a $25,000 tax lien claim alleged to be disputed and unliquidated.

Upland contends that its mortgage payments to Grace, the mortgagee-lessee, have been at higher than market interest rates, while Grace's lease payments to Upland—which have been setoff against the mortgage—have been at lower than market rental rates. Upland desires to rectify this

alleged imbalance by rejecting the unexpired lease, which is long-term, and requesting the rent be re-negotiated or set at market level.

Grace contends that on these facts, aside from the § 365(h) issue, Upland does not have a sufficient creditor base warranting reorganization. Grace asserts that this case is jurisdictionally deficient because it is not a reorganization involving various classes of creditors, particularly unsecured, who might be benefited by the enhanced rental value of the subject property.

It appears that this case is an effort by a party to relieve itself of what it perceives to be an improvident or onerous contract, with the result that its affected creditor constituency would not consist of pre-bankruptcy creditors but rather the other party to the executory lease contract. There is even a question as to whether the lessee of a rejected lease, under the circumstances of this case, could be a creditor at all under 11 U.S.C. § 365(h)(2).

The foregoing provides a questionable jurisdictional basis for launching an inquiry into the meaning and general application of a complex statute which encompasses a great number and variety of lessor/lessee relationships.

### III. THE MAJORITY RATIONALE

#### A.

The majority hinges its rationale on the hypothetical possibility of deprivation of services by the lessor, a possibility which is not specifically provided for by the statute. On the facts before us, this possibility is virtually nonexistent since the lease, which is on premises within a shopping center, imposes numerous duties on the lessee, including the duty to provide its own services and maintenance for the leased premises. The only obligation of the lessor is to maintain areas common to all tenants such as ways of ingress, egress, and parking.

Assuming that deprivation of services were a matter for our consideration, the rationalization of such deprivation as a legitimate option for the lessor in effect

brings about an increase in cost to the lessee which would be subject to offset to the extent of the fixed rent. In those cases where the deprivation substantially exceeds the fixed rent, there would be a net increase in rent since the statute appears to limit the lessee's offset to the rent reserved. If the deprivation of services, in terms of cost or practicality, becomes sufficiently uneconomic to a lessee, the deprivation would, in effect, constitute an eviction, despite the language of the statute authorizing the lessee to remain in possession. This result occurred in the case of *In re Stable Mews Associates Inc.*, 41 B.R. 594 (Bankr.S.D.N.Y.1984), which will be discussed below.

#### B.

The majority attempts to justify its treatment of leases by analogizing § 365(h)(2) with § 365(i)(2) dealing with executory contracts for the sale of land where the vendee is in possession. While the legislative history of both sections is not revealing, some background is afforded by the report of the Commission on the Bankruptcy Laws of the United States submitted July 31, 1973, which was available to Congress and presumably considered by it in connection with the present statute. The relevant portion of the Commission report, which appears in Collier on Bankruptcy, Appendix Volume 2, Part I at 199–200 (15th ed.1985), states:

Fourth, the provision in the present Act prohibiting the trustee of a former lessor from effecting any rejection that 'deprives the lessee of his estate' should be replaced. Although this imprecise language has not achieved significant judicial construction, it has provoked extensive commentary. (citing Creedon & Zinman, "Landlord's Bankruptcy: Laissez Les Lessees," 26 Bus.Law. 1391 (1971)). The Commission recommends a new provision stating that rejection of such a lease constitutes the abandonment of the leased property to the lessee and not a breach of the lease. The rule would require the debtor or his trustee to calculate whether the net value of, or cost of

performing, the lease is positive or negative. If the former, the trustee should assume for the benefit of the estate; if the latter, he should reject for the same reason.

In this connection, the Commission has concluded that the proposed Act should not impose a requirement that rejection can occur only if the trustee shows that assumption would be burdensome. Such a requirement is unnecessary in light of the trustee's general duty to maximize return to creditors and might stimulate after-the-fact reappraisals demanding from the trustees the quality of prescience (citing *Group of Institutional Investors v. Chicago, M., St. P. & P.R.R.,* 318 U.S. 523 [63 S.Ct. 727, 87 L.Ed. 959] (1942)).

The Commission report thus appears to have recommended something in the nature of the standard ultimately provided for by § 365(h)(2). While the provision of the former Act prohibiting the trustee of a former lessor from effecting any rejection that "deprives the lessee of his estate" was to some extent retained, contrary to the recommendation of the Commission, the economic test recommended by it was, in effect, applied.

The Commission's treatment of possessory land sales contracts where the debtor or trustee is a vendor was quite different. The Commission report at page 199 quotes from a paper prepared for it by Lacy entitled, *Land Sales Contracts in Bankruptcy:*

[A]n installment contract purchaser ... has made his payments in reliance on a particular asset belonging to the vendor and this, taken with his right of possession and substantial protection against loss of his rights through the default, justifies full preservation of his right to the property in the vendor's bankruptcy. If further reason is needed for distinguishing installment contracts from 'really executory' ones it may be found in the consideration that the purchaser in this kind of contract is likely to be the buyer of a home or farm or small business who

has adjusted to a new location. Very often, especially in the case of a residential buyer, he will be poor. Modern American bankruptcy policy certainly places as high a value on relieving the poor from the consequences of their own and others improvidence as in doing perfect justice between creditors."

The foregoing language is not at all descriptive of relationships between lessors and lessees of commercial premises, particularly such as may occur in Chapter 11 cases. Policy considerations dealing with contract purchases of real estate may well differ from the considerations attendant to the rejection of leases, particularly commercial leases, despite the apparently similar language of § 365(h)(2) and § 365(i)(2). The salient difference, given the common factor of possession, is that the basic characteristic of a lease is use, whereas with a contract it is ownership. On performance of the lease, the premises revert to the lessor. On performance of the contract, premises do not revert; possession continues and ownership goes to the vendee. Fundamentally, the contract is a form of conveyance with an interest in the nature of security reserved to the vendor. The vendee has purchased the property, not leased it. Thus, the vendee's interest is equivalent to that of a purchaser of real estate who has given a mortgage or deed of trust to secure the balance owing on the purchase price. This relationship is far removed from one involving parties to a lease. For further discussion of considerations attending rejection of leases or contracts with a possessory aspect, see Creedon & Zinman, "Landlord's Bankruptcy: Laissez Les Lessees," 26 Bus.Law. 1391 (1971); Siegel, "Landlord's Bankruptcy: A Proposal for Treatment of the Lease by Reference to its Component Elements," 54 Boston U.L.Rev. 903 (1974).

## IV. CASE LAW

Case authority is sparse, but except for *Stable Mews, supra,* it lends support to the lessor's position that rejection of the lease may be attended by a raise in rent. *See In*

*re Schnabel*, 612 F.2d 315 (7th Cir.1980) and *In re Freeman*, 49 F.Supp. 163 (S.D. Ga.1943) and 4A Collier on Bankruptcy ¶ 70.44 (14th ed. 1978) commenting thereon. These cases, as indicated by the majority, have been subject to criticism. However, they have not been overruled and have weight as precedent.

The case cited as supporting the majority, *In re Stabel Mews Associates*, 35 B.R. 603 (Bankr.S.D.N.Y.1983) (hereinafter "*Stable Mews I*"), is not clear-cut authority. In *Stable Mews I*, the trustee filed a motion seeking an order enabling him to reject the unexpired leases "and to compel the tenants to pay reasonable use and occupancy charges since the filing of the petition." The court referred to the language of § 70(b) of the former Bankruptcy Act providing that rejection of the lease by the lessor "does not deprive the lessee of his estate." The court was not unmindful that its conclusion was contrary to case law and commentary, quoting from 4A Collier on Bankruptcy ¶ 70.44 at 541 n. 6 (14th ed. 1978) where it was stated:

> The meaning of this provision (§ 70b) was set forth as follows in *Matter of Freeman* ... the relation of landlord and tenant is not disturbed, but the contract of rental no longer binds either of them, *and the trustee may charge and recover a reasonable rental for the demised premises until the end of the term.*

35 B.R. at 605 (emphasis supplied).

The court then pointed out that this line of reasoning was followed in the *Schnabel* case, *supra*, which in turn relied on the foregoing quotation from Collier. However, after some analysis of the language of § 365(h), the court nevertheless concluded that Congress intended that the lessee's possessory option could not be defeated by raising the rent.

It should be noted that while the trustee in *Stable Mews I* proposed to raise the rent to an allegedly reasonable amount, his actual proposal was to raise the rent by an average multiple of 5. The court thus concluded, "It would make little sense to interpret the statute to defeat that option (possession) indirectly through raising the rent *by the magnitude* proposed by the trustee here"[1] (emphasis supplied). Then, setting the scene for *Stable Mews II*, the court concluded that there would be a cap on damages chargeable to the estate from rejection of the lease by limiting such a claim only to offset against the reserved rent.

In *In re Stable Mews Associates, Inc.*, 41 B.R. 594 (Bankr.S.D.N.Y.1984) (hereinafter "*Stable Mews II*"), dispute over lease returned to the same court on the issue of whether the operating trustee could be relieved of the contractual obligations to service the building, notwithstanding the requirements of local and state laws that landlords provide essential services such as heat, water and utilities. Here, the trustee was able to deprive the tenants of services to an economically punitive degree. Nevertheless, the court held that the business judgment test authorized rejection of the lease as an executory contract. As to the contention of the tenants that the landlord must comply with the administrative code of the city of New York requiring owners of multiple dwelling units to keep the premises in good repair, properly maintain the plumbing and drainage systems, provide heat and water and so on, the court ruled that:

> These remedies, consistent with those provided by Congress, show that the exact nature of the statutory inconsistency lies in the Code's enabling a trustee to avoid *further* obligation rather than totally negate health and safety ordinances of particularly local concerns. Freeing an estate from further contractual obligations, the rejection of which, in the business judgment of the trustee, will benefit the estate and its creditors, is a hallmark of the twin federal goals of rehabilitation and maximization of the estate for the benefit of creditors. State and Local laws that stand 'as an obstacle to the accomplishment and execution of

---

1. After bankruptcy the debtor entered into a written agreement to sell the buildings for an aggregate sum of $1,750,000, conditioned upon the buildings being completely vacant.

the full purposes of Congress' under the Supremacy Clause ... are preempted. [citations omitted] Even though such laws and ordinances may otherwise be valid as an exercise of the state's police power and carry a heavy presumption against preemption, ... they must yield if they conflict with the bankruptcy laws. [citations omitted]

These considerations all support the notion that § 365, standing alone, is to be interpreted in accord with its plain language: Congress adopted a uniform test; because it was concerned for the effects of rejection on lessees of real property, it, rather than codify a variation in the test, limited the effects of rejection to supply the protection desired.

*Id.* at 597–98 (emphasis in original).

The court then reasoned that while 28 U.S.C. § 959(b) appeared to require the trustee to comply with state laws in managing property of debtors, nevertheless the housing maintenance code conflicted with § 365 of the Federal Bankruptcy Code and it was preempted thereby. The tenants in *Stable Mews I* therefore found they had won a Pyrrhic victory. The court did not allow their rent to be raised because of § 365(h)(2). But *Stable Mews II* ruled that the same statute sanctioned deprivation of services they were entitled to under the lease, with the result that the possession they were to have enjoyed by virtue of § 365(h) could be attenuated to the point of eviction.

## CONCLUSION

There is a question as to whether Congress intended that the language of § 365(h)(2) permitting the rejection of a possessory lease should be rendered meaningless in a substantial number of cases, particularly in the commercial area where the landlord provides little or no service to the lessee, as is the case here. To put the problem in another light, rejection of a commercial lease is not a meaningful alternative unless the lessor is able to, in effect, raise the rent by depriving the lessee of services representing an economic cost prohibitively beyond the agreed rent. This, would in effect, create a windfall (decried by the majority as unfair) for a lessor who can and will breach substantial commitments under the lease. A reward to such a lessor does not seem commensurate with or reasonably related to debarring the economically disabled lessor who furnishes little or no services from simply raising the rent to an amount to be set by the court at a fair market rate.

As to the argument that the language of § 365(h)(2) compels the majority conclusion, Justice Douglas discussed an analogous problem where the language of § 70(d)(5) of the former Bankruptcy Act, if literally applied, would have compelled an arguably inequitable result. Holding that such a result was not compelled by the terms of the statute, *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966), stated: "Yet we do not read these statutory words with the ease of a computer. There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." Section 365(h)(2) is sufficiently complex and so attended by a need for consideration of the policy intended by Congress so as to recommend similar considerations as to any conclusion based on a narrow examination of statutory language, particularly given the factual and procedural context of this case.

The foregoing is not an argument necessarily in favor of an interpretation contrary to that reached by the majority. It is an effort to explore, to some extent, various aspects of a complex problem. It may be, when all is said and done, that the language of § 365(h)(2) has created a problem so intractable that amendatory legislation is called for. But, in my view, a genuine controversy and the considered review attendant to it are necessary.