**In re FAMILY HEALTH SERVICES, INC., et al. Debtors.**

**CNA INSURANCE COMPANIES, Aetna Life Insurance Company, Globe Glass & Mirror Co., Gulfstream Aerospace Corporation and Royal Insurance, Appellants,**

**v.**

**FAMILY HEALTH SERVICES, INC., et al., Appellees.**

BAP No. CC–90–1010–VPO.

Bankruptcy Nos. SA 89–01549 JW, SA 89–1550 JW to SA 89–01594 JW, SA 89–2535 JW and SA 89–02536 JW.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued Feb. 20, 1991.

Submitted March 22, 1991.

Decided July 18, 1991.

Robert Orgel, Los Angeles, Cal., for appellants.

Daniel H. Willick, Los Angeles, Cal., for appellees.

Before VOLINN, PERRIS and OLLASON, Bankruptcy Judges.

OPINION

VOLINN, Bankruptcy Judge:

OVERVIEW

This is a consolidated appeal by five sub-

scribers[1] to a nationwide system of health maintenance organizations ("HMOs") from an Order ("Order" or "Second Supplemental Order") clarifying the automatic stay contained in Bankruptcy Code § 362.[2] The Order provides that no subscriber may terminate or prevent the automatic renewal of its contract with the HMOs, or interfere with the debtors' participation in the "open enrollment" periods during which employees choose their health insurance carrier. The appellants, each of whom had previously terminated their relationship with the HMOs, appeal this Order on a variety of grounds.

We reverse and vacate the Order.

## FACTUAL AND PROCEDURAL BACKGROUND

This bankruptcy case arises from the Chapter 11 petitions filed by Family Health Services, Inc. and forty-seven of its related companies, all of which petitions were consolidated for joint administration. These companies (referred to collectively herein as "debtor" or "Maxicare") operate a national network of health maintenance organizations which at one time provided health care coverage to over 600,000 enrollees and their dependents in seven states. This number has decreased considerably since the filing of the petitions. Most enrollees, or Plan members, are current or retired employees of companies (also referred to herein as "subscribers") that purchase health insurance coverage from Maxicare. Maxicare in turn contracts with hospitals, physician groups, medical laboratories, and other health care organizations. There is also a group of medical providers who have no pre-arranged agreements with Maxicare. This group includes medical specialists and emergency medical personnel.

When most of the Chapter 11 petitions were filed on March 15, 1989, Maxicare had total assets of $668 million and liabilities of $800 million. There were over 100,000 creditors and an unknown number of en-

rollees who might have claims against the estate. There is no dispute that the income generated by the agreements between Maxicare and employers was critical to the continued operation of Maxicare and to the debtor's ability to pay the outstanding claims.

Prior to the issuance of the Second Supplemental Order, the debtor obtained a series of orders designed to clarify the scope of the automatic stay as it applies to subscribers and to medical providers. Initially, on motion by the debtor, the trial court issued an order in late March, 1989 which set forth the terms of the automatic stay and specifically enjoined all persons from "[t]aking any act to obtain possession of property of the Debtors or [taking] property from any of the debtors" and from "in any ... way interfering with any and all property of the Debtors."

Debtor moved for a further clarification of the automatic stay on May 3, 1989. After a hearing on July 20, 1989, the trial court entered an order ("First Supplemental Order") which made clear that the automatic stay applied to the subscribers, who were enjoined from, *inter alia*, withholding payments due to Maxicare and from taking any other action, by offset or otherwise, to collect on claims against the debtor. Thus, the contractual relationships between all subscribers and the debtor were deemed continued by virtue of the court's orders.

Notwithstanding these orders, which were not appealed, over eighty subscribers, without first obtaining relief from stay, sent Maxicare notices of termination and in many cases refused to offer Maxicare to its employees. In response, debtor initiated a limited number of adversary proceedings and, as a result, obtained favorable settlements or court orders prohibiting such actions.

In a motion dated November 16, 1989, debtor moved for a further clarification of the automatic stay. It complained that

---

1. The appellants in Case No. CC–90–1010 are CNA Insurance Companies, Aetna Life Insurance Company, Globe Glass & Mirror Co., Gulfstream Aerospace Corporation and Royal Insurance.

2. Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330.

there remained dozens of employers who were not deterred by the successful prosecution of the adversary proceedings or by debtor's efforts to persuade them that their actions violated the automatic stay. Many had terminated their agreements and had failed to include Maxicare among the options offered during their "open enrollment" periods, *i.e.*, periods of time during which employees had the option of changing or remaining with current health insurance coverage. Debtor asserted that the problem was "so widespread" that the "only practical means available" to put an end to these contract terminations was a further clarifying order.

Specifically, the debtor sought to enjoin all subscribers from terminating their agreements, and from taking any action to prevent the contracts' automatic renewal without first obtaining relief from stay. The debtor also requested that the court require the subscribers to offer Maxicare to their employees during the open enrollment periods.

It is apparent that the debtor was faced with the need to initiate numerous adversary proceedings (or, possibly, an unwieldy class action) in order to prevent or inhibit defections which could have the effect of unravelling a large and complex network designed to provided health care for hundreds of thousands of persons. Maxicare's "clarification" motion was an effort calculated to hold together its constituent components: the subscribers (and, ultimately, their employees) as well as the health care providers.

Maxicare's motion specified forty-two subscribers that had terminated their agreements, but the record does not reveal how many of these subscribers received notice of the motion. The motion referred to only one specific contract (with appellant CNA Insurance Companies ("CNA")) which was said to be "typical" of the agreements with the "vast majority of subscribers, including virtually all, if not all ..." of the forty-two employers named in the motion.

Numerous employers opposed debtor's motion. The trial court held a hearing on the motion on December 11, 1989. The court, apparently referring to the CNA–Maxicare contract as well as to the other agreements attached to the opposition papers, stated that the contractual relationships were "relatively simple" in that either party "has the option to renew or terminate every year," and that if nothing is done, the contracts automatically renew. The court held that the subscribers "must get relief from stay in order to give that [nonrenewal] notice. Any notice that they give without having the stay lifted, even though it's timely in the agreement, is a violation of 362, and the notice is of no effect." The trial court also indicated that it was "presently not inclined" to grant to the subscribers who terminated their agreements either prospective or retroactive relief from stay.[3]

Counsel for several of the subscribers requested an evidentiary hearing so that the court could examine the various subscriber agreements. The court refused the request stating "absent a ... settlement between the debtor and your clients, we'll, I suggest do that in the context of either a contempt proceeding or an adversary proceeding for damages."

After considerable colloquy in open court, the trial court entered the Second Supplemental Order. The Order was issued pursuant to 11 U.S.C. §§ 105 and 362 and enjoined all subscribers from: 1) taking any action to terminate their agreements with debtors without first obtaining relief from the automatic stay; 2) taking any action to prevent the automatic renewal of their agreements without first obtaining relief from stay; or 3) conducting open enrollments without allowing debtors "full and fair participation." The Order also provided that it was being entered "without prejudice to the right of any party to assert that any specific act or omission is or was not in violation of Sections 362, 365 or any other provision of the Bankruptcy Code...."

---

**3.** The subscribers' motions for relief from the automatic stay are treated in separate dispositions dealing with BAP Case Nos. CC–90–1441 and CC–90–1529.

## ISSUE

The issue in this appeal is whether the trial court was warranted in issuing the Second Supplemental Order.

## STANDARD OF REVIEW

■ This appeal raises the question of whether a particular controversy is justiciable, which is an issue of law and subject to a *de novo* standard of review. *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir.1986).

## DISCUSSION

■ The difficult question in this case is determining exactly what the Second Supplemental Order does and to whom is it directed. The debtor contends that the Order is a modification of the automatic stay within the equitable power of the trial court and that it does not enjoin conduct by specific subscribers. Appellants argue that it imposes new injunctive relief which can only be granted, pursuant to Bankruptcy Rule 7001(7) [4], in the context of an adversary proceeding. One thing is clear: the Second Supplemental Order was designed to provide a basis for the debtor's effort to maintain a structure sufficient to provide continued health care to its large constituency. The trial court, by its comments from the bench and by entering the Order, sent a distinct signal to the subscribers that as to those who would unilaterally sever or alter their relationships with the debtor, there would be exposure to the risk of sanctions pursuant to Code §§ 105 or 362(h).

The issue before us, then, is whether the Order, *albeit* entered under emergent conditions, was a valid exercise of the trial court's power under the Bankruptcy Code. The Order states that it is without prejudice "to the right of *any party*" to assert that a violation of the automatic stay had or had not occurred. (Emphasis added). The Order, in this respect, appears to provide that the court did not reach a determination that specific subscriber agreements contained automatic renewal provisions or that the automatic stay bars attempts by particular subscribers to terminate or alter their agreements.[5] Thus, the court's "clarification" of the automatic stay did not resolve a dispute, in an adversary context but rather constituted a ruling on a hypothetical or non-justiciable controversy.

"[T]he oldest and most consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions." *Flast v. Cohen*, 392 U.S. 83, 96, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968), quoting from C. Wright, Federal Courts 34 (1963). This concept of justiciability derives from the use in Article III of the Constitution of the words "cases" and "controversies" which "limit the business of the federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through judicial process." *Id.* at 94, 88 S.Ct. at 1949.[6] While there are many examples of advisory opinions, one type adverted to corresponds with the order before us, namely, where the "dispute" has not been properly framed and requires further proceedings. 13 Wright, Miller & Cooper, *Federal Practice and Procedure*, § 3529.1 at 297–98 (2nd Ed.1984). "[S]uch advance expressions of legal judgment upon issues which remain unfocused because they are not pressed ... with that clear concreteness provided when a question emerges precisely framed and necessary for decision ..., we have consistently refused to give." *United States v. Fruehauf*, 365 U.S. 146, 157, 81 S.Ct. 547, 554, 5 L.Ed.2d 476 (1961).

**4.** Bankruptcy Rule 7001(7) provides: that an adversary proceeding: "is a proceeding ... (7) to obtain an injunction or other equitable relief...."

**5.** We note that all subscriber agreements were subject to, on an annual basis, adjustment or negotiation with respect to the element of consideration. This element in a medical context, given its notorious cost escalations, would inevitably require the parties' deliberation and consent to the renewed contracts.

**6.** The justiciability concept which guides Article III courts has been held to apply with equal force to the bankruptcy courts. *In re Upland/Euclid, Ltd.*, 56 B.R. 250, 255 (9th Cir. BAP 1985); *In re Burckhardt*, 8 B.R. 327, 330 (Bankr. D.P.R.1980).

Aside from due process issues such as notice to all subscribers of specific claims and the identification of particular parties in compliance with Bankruptcy Rule 7001(7), Maxicare failed to frame a "concrete" legal dispute which required judicial intervention. Thus, the resulting Order is at best an abstract interpretation of the automatic stay. Because the Order does not resolve a true controversy between adversaries it places the parties connected with the debtors' estate in a quandary as to its impact on their legal rights. This is what the prohibition against advisory opinions is calculated to prevent.

There is another reason for this result. While a court sitting in equity has broad powers to modify preexisting injunctions to deal with changed factual or legal conditions, *see e.g., United States v. United Shoe Machinery Corporation,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), there was no change in circumstances here which justified the issuance of the trial court's "clarification." The automatic stay is a unique injunction in that it is imposed immediately by operation of law when a bankruptcy petition is filed, and requires no showing of the elements that are otherwise uniformly required before any other form of injunctive relief is issued by federal or state courts. *See In re Kim,* 71 B.R. 1011, 1015 (Bankr.C.D.Cal.1987) (explaining policy behind allocation of burden of proof in relief from stay motions). It is questionable that anything is added to the force of 11 U.S.C. § 362 by advance comment on the scope of the automatic stay in the form of a "clarification," particularly where such order is not issued in response to particular conduct by specific parties.

### CONCLUSION

The Second Supplemental Order was an inappropriate advisory opinion. Accordingly, the bankruptcy court's decision is reversed and the Order is hereby vacated.