**ACME PRECISION BUILDING, LIMITED, Plaintiff,**

v.

**DAYTON FORGING & HEAT TREATING, INC., Defendant.**

In the Matter of ACME PRECISION BUILDING, LTD., Debtor.

Adv. No. 3–82–0067.
Bankruptcy No. 3–80–03428.

United States Bankruptcy Court,
S. D. Ohio, W. D.

Sept. 9, 1982.

Horace W. Baggott, Jr., Dayton, Ohio, for debtor/defendant.

Alan Schaeffer, Frank Root, Dayton, Ohio, for defendant.

## DECISION AND ORDER

CHARLES A. ANDERSON, Bankruptcy Judge.

### PRELIMINARY PROCEDURE

Acme Precision Building, Ltd. (Acme) filed a complaint on 9 February 1982 against Dayton Forging & Heat Treating, Inc. (Dayton Forging) seeking termination of the lease between the parties and a forfeiture of the leasehold interest.

On 19 February 1982 Dayton Forging filed an answer and counter-claim seeking damages and other relief, placed at issue by the Answer of Acme filed 16 March 1982.

On 9 April 1982 Dayton Forging filed a motion for hearing pursuant to Rule 12(d) Federal Rules of Civil Procedure for dismissal for failure to state a cause of action. At a pretrial conference disposition of the motion to dismiss was deferred until after trial.

The matter has been submitted on the pleadings, pretrial order entered 15 March 1982 and extensive oral and documentary evidence adduced at the trial on April 19, June 8 and June 28, 1982.

Postrial briefs were filed by Plaintiff on 19 July 1982 and by Defendant on 23 July 1982.

## FINDINGS OF FACT

An involuntary petition under Chapter 11 of Title 11 of the United States Code was filed on 29 October 1980 against Acme Precision Building, Ltd., an Ohio Limited Partnership, by Imperial Management, Inc., signed by Frederic E. Gagel, as President, Service of process was made upon G.W.F. Inc., Ltd. General Partner of Acme, by serving Fred E. Gagel personally as General Partner of G.W.F. Inc., Ltd. and partner of Acme. An Order of Relief was entered on 7 November 1980 upon "consent" of Acme.

On 5 February 1981 Acme filed a Plan for Reorganization and a Disclosure Statement.

On 24 March 1981 an "Objection to the Disclosure Statement and Request to Stay Further Proceedings Due to Motion to Consolidate Pending in Case No. 3–81–00699" was filed by H. Garrett Frey, owner of an interest in G.W.F. Inc., Ltd., an Ohio General partnership "which owns a 99% interest" in Acme. (Gagel under Case No. 3–81–00699 had filed on 4 March 1981 an involuntary petition against G.W.F. Ltd.).

Before consummation of the internecine litigation among the intertwining ownership interests of the limited and general partnerships, on 30 June 1981 Dayton Forging and Heat Treating, Inc., filed an Application for an order directing Acme to assume or reject the lease existing between the parties.

On 2 February 1982 an order was entered that the Debtor-in-Possession "shall on or before February 22, 1982, assume or reject the aforesaid lease, and if the debtor-in-possession does not assume said lease on or before said date, then said lease shall be deemed rejected. . . ." No filing has been made to date in compliance with this order.

Dayton Forging is a tenant of Acme pursuant to a lease agreement and assignment originally executed on 13 July 1973 and assumed by Dayton Forging as of January 1, 1975. The execution and validity of the lease and subsequent assignment are not at issue.

Dayton Forging is the primary tenant in the premises and the rents are vital to any possible reorganization under Chapter 11 of the Bankruptcy Code.

Even though the factual details are quite complex, the economic ramifications and consequences of the lease are critical to both litigants. A conservative estimate of expenses to Dayton Forging to vacate the premises is at least $200,000.00.

The physical condition of the premises is deplorable, as the direct result of leaks in the roof which not only impede business operations of the tenant but place the manufacturing equipment in severe jeopardy. This equipment is so large and ponderous as to render relocation practically impossible, and, further, is extremely precision and delicate in nature, rendering any water damage as critical. The rain damages also have been experienced in the area occupied by the general administrative and executive offices.

This defective condition existed long prior to invoking bankruptcy court jurisdiction on 28 November 1980 and has persisted to date. Complaints as to the roof and building conditions have been lodged by Dayton Forging with Acme since 1975 after nearly every heavy rainfall. The severity of damages has been progressive. Acme has repeatedly sent a crew to the premises to make repairs, with no permanent success. Various areas of the complex are not usable, primarily because of water damages, such as an upper room above the laboratory, the upper restroom for employees, the storage area in the northwest factory areas, and the entire sand shed areas.

During heavy rainfall periods, it has become necessary to vacate portions of the area in use, especially the metallurgical area.

There can be no doubt that the only solution to this existing condition would be the removal and replacement of the entire roof systems of the factory and sand shed. It is also likely that considerable deck replacement and masonry wall repair would be required. The roof over the office area possibly would not need replacement.

Roof replacement is an expense which Acme cannot bear financially; and, the con-

tractual rents are inadequate for the business to remain viable under the present market conditions.

The facts demonstrate that Acme is without doubt in violation of Section 8 of the Lease Agreement, as follows:

## 8 REPAIRS

Lessor will make all structural (meaning necessary to support said building) repairs and maintain the exterior of the demised premises including the roof, floors, gutters and downspouts, elevators, water tower, parking lots and grounds in good repair and tenantable condition during the continuance of this lease or any extension thereof, and to maintain all the above in conformance to governmental regulations. The lessee shall maintain the interior of the demised premises, including painting and shall make all normal repairs and maintenance to the heating, air-conditioning, and plumbing systems. All electrical repairs shall be the Lessee's responsibility and the Lessee agrees to maintain the items it is obligated to repair in conformity with governmental regulations. Notwithstanding any other provisions of this paragraph, Lessor and Lessee agree to make or pay for such repairs or replacements as are caused by Lessor or Lessee, respectively, or their agents, employees or contractors.

Another serious conflict has developed between the parties regarding Paragraph 7 of the Lease, as follows:

From and after August 1, 1973, the Lessor shall be responsible for the payment of the bills for all water, electricity and gas consumed on the entire premises and the Lessee shall pay its prorata share to Lessor with each monthly rental payment.

It is the purpose of this agreement to prorate utilities on the basis of usage until such time as separate meters shall be installed. This agreement shall be subject to adjustment by mutual agreement of the parties based on actual usage in the future or in the event of any rate adjustment either upwards or downwards.

Until any adjustment is made, Lessee shall pay the following amount on the first day of each month during the leased term in addition to the monthly rental payments:

| | |
|---|---|
| Water | $ 125.00 |
| Electricity | 1,515.00 |
| Gas | 790.00 |
| Total | $2,430.00 |

Furthermore, there has been a long and often acrimonious discussion and exchange of offers and counteroffers pertaining to the exact amounts for which Dayton Forging is responsible on utility charges. Much of the confusion stems from two separate factors. The first problem arises from sewer and water charges and the fact that the reimbursable amounts were to be by agreement as determined by the parties until separate meters were installed to differentiate between Dayton Forging's share and the shares of other tenants. Acme has not seriously pursued the matter of fixing rates since early 1980, and has not since that time even billed Dayton Forging. Since the other tenants have vacated, utter confusion has existed on the *quantum* of water used by Dayton Forging.

Since on or about March 12, 1980, the basic disagreement of the parties has not been advanced beyond a demand by Acme for payment of 80% of the total billing for all tenants or portions of the premises for sewer and water charges and an offer by Dayton Forging to pay its share estimated at 44.76% of the water charges.

Dayton Forging pays Acme the sum of $83,820.00 per annum in rents, which payments have been and are still kept current, save for the disagreement over the utilities. Acme has continually accepted the monthly rents of $6,985.00 despite the dispute since 1977 as to reimbursable expenses owing by Dayton Forging, which *en toto* would be less than one-month's rent.

The same confusion has existed relative to the expenses incurred for county trash collection services. Even though there might well be a disagreement under the lease terms as to whether the tenant is bound to reimburse for this item, for several years (when billed by Acme) Dayton

Forging reimbursed an annual charge from the County to Acme in the amount of $250.00.

Paragraph 24 of the lease agreement provides as to Default, as follows:

### 24. DEFAULT

If the Lessee shall fail to pay the Lessor rent and/or other sums of money payable to Lessor as and when due and payable hereunder and such default shall continue for a period of ten (10) days after written notice thereof shall be given to the Lessee by the Lessor, or in the case of the Lessee shall fail to comply with any other provision or condition of this lease agreement on its part to be kept and performed of such default shall continue for a period of twenty (20) days after written notice thereof shall be given to the Lessee by the Lessor, or if the Lessee shall be adjudged bankrupt, or shall make an assignment for the benefit of creditors or if receiver of any property of the Lessee in or under said premises for all or part of Lessee's interest hereunder by appointed in any action, suit or proceeding, by or against the Lessee and such adjudication, assignment, or appointment shall not be vacated or annuled within sixty (60) days, or if the interest of the Lessee in said premises shall be sold under execution, or other legal process, of attached, or if Lessee shall assign this lease or sublet all or any part of the demised premises contrary to the provisions hereof, it shall be lawful for the Lessor to enter upon said premises, and again have, repossess, and enjoy the same as if this lease had not been made, and there upon this lease and everything herein contained on the part of the Lessor to be done and performed shall cease and determine, without prejudice, however, to the right of the Lessor to recover from this lease all rent due up to the time of such entry by the Lessor; said Lessor may relet said premises for the remainder of said term for the highest rent reasonable obtainable and may recover from the Lessee and deficiency between the amount so obtained and the rent herein reserved.

Should the Lessor suffer bankruptcy or receivership, or any form of liquidation, the rights of Lessee shall remain as stated herein.

## CONCLUSIONS OF FACT

The condition of the roof is deplorable, at best. Repeated patching efforts, although well intended, have been completely inadequate and often incompetent. The condition has not only persisted for many years, but has progressively deteriorated to the point of the obvious need for a major rehabilitation. There is no doubt whatever that this chronic condition has been, and is still, a major violation of the lease contract by Acme.

There is also no doubt that Dayton Forging has not maintained payments for utility charges. In lieu of such payments (and the inability of the parties to resolve the effects of changing circumstances) Dayton Forging should have made an exact accounting to Acme for the elements of damages resulting from the deplorable structural conditions, especially the roof.

In final analysis, nevertheless, as a factual matter, all of the conflicts between the parties revolve around the lack of adequate income from the lease rents to keep the premises in proper condition; and, the various disagreements and contentions concerning the utilities are secondary and financially insignificant, considering the lease agreement in its entirety.

## CONCLUSIONS OF LAW AND FACT

### I

█ The complaint by Acme must be denied for failure of proof giving rise to a forfeiture of the lease and leasehold. The evidence most favorable interpreted would demonstrate only insignificant, hypertechnical violations. Looking to Ohio law and case precedents, we find that these authorities, although by trial and intermediate appellate courts, conform to the same general principles as developed in other states and learned treatises.

Quoting from *33 O.Jur.2d Landlord and Tenant:*

§ 560. NECESSITY FOR STRICT CONSTRUCTION AND COMPLIANCE.—Forfeitures of leaseholds are not favored in equity or at law. Accordingly, a provision for such a forfeiture must be strictly construed and doubts resolved against the person asserting the forfeiture. If the provision is vague and uncertain, it will not be enforced, nor will a forfeiture be decreed for a cause not specifically covered by the agreement of the parties. Some causes of forfeiture being expressly mentioned, none other can be applied. Nor where an express condition is written in a lease as to the right of the lessor to declare forfeiture thereof for a certain cause, can a covenant authorizing forfeiture for such cause be implied, in direct opposition to the plain provisions of the written contract. Moreover, since a forfeiture of a lease is not looked upon with favor in the law, every fact and circumstance requisite to constitute such forfeiture must be established by the person claiming the same, without the benefit of any presumption in his favor. [Footnote citations deleted].

For application for such universal principles, we note *Gould v. Hyatt,* 4 Ohio Law Abs. 468, 154 N.E. 173 (1926); *Southern Hotel Co. v. Miscott,* 44 Ohio App.2d 217, 73 Ohio Op.2d 235, 337 N.E.2d 660 (1975). Generally, see *49 Am.Jur.2d, Landlord and Tenant* § 1021; *20 O.Jur.2d Equity §§ 33 et seq.*

■ Furthermore, acceptance of the annual rents in the amount of $83,820.00 per annum would constitute a waiver of the right to forfeiture. See *Williston on Contracts, 3rd Edition, Volume 5, § 687; Brokamp v. Linneman,* 20 Ohio App. 199, 153 N.E. 130 (1923); *Boyd v. Talbert,* 12 Ohio 212; *Smith v. Whitbeck,* 13 Ohio St. 471; and *49 Am.Jur.2d Landlord and Tenant § 1634.*

## II

■ Having concluded that a forfeiture of the lease and leasehold must be denied, we confront the realities of the Chapter 11 Reorganization, specifically a critical economic crisis arising in great part from a lease contract burdensome because of epidemic financial conditions affecting the national business community. Economic resources of Acme do not afford sufficient income to invest in the new roof and exterior building repairs so vitally necessary. There is no evidence of record *instanter* that the tenant whose contractual rent obligation is the life blood of the Debtor has been in any manner amenable to negotiations leading to alleviating or mitigating an imponderable dilemma.

Since the Ohio and general property law do not afford the solution, it is necessary to turn to principles and remedies provided by the Bankruptcy Code and principles thereunder. The complaint of Acme seeking a forfeiture of the lease and the failure to accept or reject the lease within the rule date can and must be deemed as a rejection of the lease by the Debtor-in-Possession, which is in violation of the contract terms and cannot survive thereunder.

Rejection terminated the duty of Acme to perform the incidental obligations of a lessor other than to provide the premises to Dayton Forging as lessee. If the lessee elects to remain in possession, it is liable for rental payments reserved in the lease, but may offset from those rentals any damages caused by nonperformance of the lessor's incidental obligations.

■ If Dayton Forging elects to remain in possession, it has no recourse against Acme for breaches of the lessor's obligation beyond the right of offset. 11 U.S.C. § 365(h).

■ The rejection of the unexpired lease constitutes a breach of the lease contract as of the date immediately preceding the filing of the petition in Chapter 11 and constitutes, therefor, a prepetition claim for which there are no affirmative rights against the estate for damages resulting from the rejection. 11 U.S.C. § 365(g). If Dayton Forging chooses to treat the lease as terminated, it has a nonadministrative claim against the estate. H. Report No. 95–595, p. 349, U.S.Code Cong. & Admin.

News 1978, p. 5787, Brk-L. Ed. Legislative History § 82:16. 11 U.S.C. § 365(h)(1) and (2).

Accordingly, by so removing all controversies over the landlord-tenant relationship, and the economic impediments, the slate is now clean to enable the Debtor-in-Possession to confront reality and the necessity of presenting a viable plan of reorganization.

ORDERED, ADJUDGED AND DECREED, that the lease between Plaintiff, Acme Precision Building, Ltd., and Defendant, Dayton Forging & Heat Treating, Inc., is deemed rejected conformably to 11 U.S.C. § 365 and Plaintiff is granted leave for thirty days to file a modified Plan of Reorganization accordingly.