**In re Sok Jun KONG and Ki Hwa Kong, Debtors.**

**Bankruptcy No. 193–12815–260.**

United States Bankruptcy Court, E.D. New York.

Dec. 27, 1993.

Randy A. Dusek, New York City, for debtors.

Robert G. Del Gadio by A. Jeffrey Spiro, Uniondale, NY, for Getty Petroleum Corp.

Office of the U.S. Trustee by Alfred Dimino, Garden City, NY.

## DECISION

CONRAD B. DUBERSTEIN, Chief Judge.

Getty Petroleum Corp. ("Getty") moved this Court for an order dismissing the Debtors' Chapter 13 Petition prior to its conversion to its present Chapter 11 status,[1] or in the alternative, directing Sok Jun Kong (hereinafter referred to as "Sok"), one of the Debtors herein,[2] to pay postpetition rent and post rent security, or further in the alternative, lifting the automatic stay under section 362 in order to continue a State Court action for non-payment of rent pursuant to a certain lease agreement entered into between Getty and Sok. In addition, Getty seeks the costs, expenses, and reasonable attorney's fees associated with its motion and for such other and further relief as this Court deems just and proper. The motion in its entirety has gone forward in this Chapter 11 case. The Debtors have cross-moved seeking to have the relief sought by Getty denied. The relationship between Getty, Sok, and the remaining Debtor Ki Hwa Kong and the rights and obligations as between Getty and said Debtors are hereafter spelled out in greater detail. For the reasons hereinafter set forth, Getty's motion is granted in part[3] and the Debtors' cross-motion is denied.

## I. FACTS

On January 11, 1977, Power Test Petroleum Distributors, Inc. ("Power Test"), a wholly-owned subsidiary of Getty, entered into a lease as Tenant ("Lease I") with regard to premises known as 163–10 Pidgeon Meadow Road, Queens, New York (the "Premises"). At that time, the Premises were owned by Anne N. Albert and Sylvia A. Fieber, (the "Landlords"). Subsequently, Anne N. Albert was succeeded by Norman A. Fieber.

---

1. The Chapter 13 case was converted to a case under Chapter 11 by order of this Court dated April 12, 1993.

2. Sok Jun Kong and his wife Ki Hwa Kong are joint debtors.

3. As set forth more fully below, several aspects of Getty's motion were disposed of prior to this decision being rendered.

Lease I was to commence as of April 1, 1977, for an initial period of ten years, with Power Test having two consecutive options to renew, each for an additional five year term. The lease provided for a stated rent of $8,100.00 per year for the first five years and $8,220.00 per year for the second five years. In the event Tenant exercised its option to renew, the stated rent was to be $9,300.00 and $11,100.00 per annum, respectively for the first and second five-year options. It further provided that in order to exercise its option to renew, Power Test had to notify the Landlords in writing at least ninety days prior to the expiration of the preceding term. Such notice would be sufficient if made by personal delivery, telegraph or mailed to the Landlords at the address listed in the lease.

Lease I was drafted by Power Test and, as signed by the parties, contained various handwritten deletions and additions including the deletion of paragraph 11, titled "Assignment and Subletting," which provided as follows:

Landlord consents that Tenant may assign or sublet the premises, provided that Tenant shall remain liable to Landlord for the performance of all the terms hereof.

On February 1, 1985, Power Test entered into a sublease agreement[4] with Getty whereby Power Test leased to Getty all the real property Power Test was leasing as of that date and all properties thereafter leased by Power Test as tenant. Annexed to the agreement was a list of all properties then leased by Power Test, which included the subject Premises.

On May 22, 1986, Sok entered into a Retail Gasoline Station Lease Agreement ("Lease II") as Tenant, with Getty as the Landlord, for the purpose of operating a gasoline service station on the Premises. From that time, Sok has been the proprietor of said gasoline station.

Power Test exercised its first option to renew Lease I on December 29, 1986 by

letter addressed to Norman A. Fieber and Sylvia A. Fieber, extending the lease to March 31, 1992.

On March 9, 1988, Power Test was given notice that the Premises were conveyed to the Debtors herein subject to the terms and conditions of Lease I. Thus, as of that date, the Debtors were the owners/lessors of the Premises with Power Test as the lessee and Getty as the sublessee, while at the same time Sok was the sublessee of the subleased Premises with Getty as the sublessor.

Thereafter, on August 28, 1990, Sok renewed Lease II to run from January 1, 1991 to March 31, 1992 at a monthly base rent of $4,000.00. In addition, Lease II required Sok to (1) continuously operate the Premises as a Gasoline Station for a minimum of eighteen hours per day, seven days a week and (2) purchase from Getty a minimum of 32,000 gallons of gasoline per month. Sok was required to pay, as additional rent, $.06 per gallon for any difference between the minimum purchase requirement and the amount actually purchased.

On October 18, 1991, Power Test exercised its second option to renew, extending Lease I to March 31, 1997, by certified mail, return receipt requested, addressed to the Debtors at the address listed in Lease II. This letter was returned unclaimed and thereafter resent on November 12, 1991, by regular mail.

On March 10, 1993, Getty, as sublessor, commenced a non-payment action against Sok, as sublessee, in the Civil Court of the City of New York for failure to make rent payments pursuant to Lease II seeking a judgment in the amount of $30,223.50[5] plus attorney's fees and interest from October 1, 1992.[6]

The Debtors filed for relief under Chapter 13 of the Bankruptcy Code on April 5, 1993. Subsequently, on ex-parte application of the Debtors, the Chapter 13 case was converted, by order of this Court dated April 12, 1993, to a case under Chapter 11.

4.  The Court notes that although this agreement is titled "Sublease Agreement," the parties have used the terms "assignment" and "sublease" interchangeably when referring to this transaction.

5.  This amount includes base rent and additional amounts for the gallonage requirement, taxes, insurance, and late charges due under the terms of the lease.

6.  This is the date the arrearage began.

As hereinabove set forth, on April 9, 1993, Getty moved this Court while the Chapter 13 case was still pending, to dismiss it or in the alternative, directing Sok to pay postpetition rent and post rent security, or further in the alternative, lifting the automatic stay under section 362 in order to continue a State Court action for non-payment of rent pursuant to a certain lease agreement entered into between Getty and Sok. In addition, Getty seeks the costs, expenses, and reasonable attorney's fees associated with its motion and for such other and further relief as this Court deems just and proper. After a hearing, this Court signed an order, dated April 21, 1993, directing Sok to pay, pursuant to Lease II, postpetition rent in the amount of $4,000.00 per month to Getty, subject to further order of the Court. Thereafter, on July 6, 1993, the Debtors, as landlords of the Premises, filed their cross-motion to Getty's motion hereinabove referred to. In essence, the effect of the cross-motion was aimed at rejecting Lease I.

In response to the Debtors' cross-motion, Getty produced the Affidavit of Samuel M. Jones, Vice President and General Counsel of Getty sworn to July 16, 1993, stating that 1) Power Test is a wholly-owned subsidiary of Getty; 2) Sok established a franchise relationship with Getty upon the signing of Lease II; and 3) Power Test continued to make its rent payments to the Debtors pursuant to Lease I with funds provided by Getty.

Getty also produced copies of the "Sublease Agreement" between Power Test and Getty and contends that the fact that the assignment and subletting paragraph of Lease I was crossed out does not imply a restriction on Power Test and absent an express restriction to the contrary, a tenant, such as Power Test, has the absolute right to assign its lease or to sublet the premises leased to it. Thus, Getty argues that in the absence of an express restriction against assignment or subletting, it had the right to do so. In addition, it contended that Power Test, utilizing funds provided by Getty, continued to make and the Debtors continued to accept the rent payments due under Lease I certainly up to the date of said affidavit of Samuel M. Jones. However, Sok is in default under Lease II. Accordingly, Getty maintains that it has an unsecured claim against Sok by virtue of the sublease between Power Test and Getty and Lease II.

Sok defaulted on the postpetition payments due pursuant to this Court's Order, dated, April 21, 1993, and on September 7, 1993, the automatic stay was lifted, enabling the parties to proceed with their landlord and tenant action in the State Court on Lease II. In a decision dated December 7, 1993, the Civil Court of the County of Queens, found that "the various defenses raised by the respondents [Sok] are without merit." After trial, the court found that "based upon credible evidence," Getty is owed the sum of $67,876.98 for the period from March 17, 1993 to November 30, 1993 less the $8,443.52 held by Getty as security. The court further found that Getty is entitled to recover the sum of $10,000.00 as reasonable attorney's fees.

The Debtors' petition and schedules do not list Getty or Power Test as creditors. However, Lease I and Lease II are listed on Debtors' Schedule G as "Executory Contracts," which the Debtors allege were breached by Power Test and Getty on the grounds that the provision allowing Power Test to assign or sublet was stricken from Lease I, and therefore, Lease I could not be assigned or sublet to Getty.

The Debtors' cross-motion argues that Getty is not a party in interest because it was Power Test that entered into Lease I, not Getty, and in the alternative that even if Power Test's sublet to Getty was appropriate, Getty failed to properly exercise the second option to renew. In support of their cross-motion, Debtors contend that Power Test breached Lease I prepetition by its sublease to Getty because Lease I did not contain a provision allowing assignment or subletting. Although Debtors' papers are unclear, as appears from the above the cross-motion is apparently an effort to reject Lease I and terminate Getty's leasehold interest.

## II.  DISCUSSION

### A.  Prepetition Breach of Lease I

■ Section 365 of the Bankruptcy Code balances the rights of a debtor-lessor against

those of a non-debtor lessee. Section 365(a) of the Bankruptcy Code provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Debtors-in-possession, have all the powers of a trustee and thus may reject any and all unexpired leases that encumber the estate. 11 U.S.C. § 1107(a). However, before section 365 applies enabling a debtor to exercise this power, it must be established that an executory contract or unexpired lease exists at the time of the filing. 2 Lawrence P. King et al., Collier on Bankruptcy, ¶ 365.-02, at 365–16 (15th ed. 1992) [hereinafter *Collier* ]; *see In re Airport Executive Ctr., Ltd.,* 138 B.R. 628, 629 (Bankr.M.D.Fla.1992) (§ 365 applies to existing prepetition leases). "If the contract or lease has expired by its own terms or has been terminated prior to the commencement of the bankruptcy case, then there is nothing left for the [Debtor] to assume or [reject]." *Collier,* ¶ 365.02, at 365–16 & ¶ 365.04, at 365–37; *Miller v. Romberger (In re Romberger),* 150 B.R. 125, 126–27 (Bankr.M.D.Pa.1992) (contract terminated prepetition not part of bankruptcy estate). Thus, it is necessary to determine whether there is an executory lease remaining to reject, because, if as Debtors contend, Power Test breached Lease I prepetition through the sublet to Getty, and such breach is deemed to be material, Debtors would have the option to treat their obligations as discharged and terminate Getty's leasehold interest. *See Aslan v. Sycamore Inv. Co. (In re Aslan),* 909 F.2d 367, 372 (9th Cir.1990).

A material breach by a party to an executory contract before the bankruptcy of either party gives the other party a unilateral option to treat his own obligations under the contract as discharged and claim damages for the breach or to waive the breach and treat the contract as still in effect.

*Benevides v. Alexander (In re Alexander),* 670 F.2d 885, 887 n. 1 (9th Cir.1982) (quoting Vern Countryman, *Executory Contracts in Bankruptcy: Part II,* 58 Minn.L.Rev. 479, 506 (1974)).

### State Law Analysis

■ Whether or not a lease has terminated prior to bankruptcy is a question of state law. *In re Arden and Howe Assocs., Ltd.,* 152 B.R. 971, 974 (Bankr.E.D.Ca.1993); *In re S.E. Nichols Inc.,* 120 B.R. 745, 748 (Bankr. S.D.N.Y.1990) (interpretation of legal status of lease governed by state law); Benjamin Weintraub & Alan N. Resnick, Bankruptcy Law Manual, ¶ 7.10[1], at 7–92 (3d ed. 1992). According to the Supreme Court, "[i]n the absence of a controlling federal rule, we generally assume that Congress has 'left the determination of property rights in the assets of a bankrupt's estate to state law,' since such '[p]roperty interests are created and defined by state law.' " *Nobelman v. American Savs. Bank,* —— U.S. ——, ——, 113 S.Ct. 2106, 2110, 124 L.Ed.2d 228 (1993) (quoting *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979)).

As more fully set forth below, Debtors' arguments analyzed under state law fail for several reasons.

### a. Express Right to Assign or Sublet

■ Firstly, it is long and well established common law in New York that, absent a statute or an express agreement to the contrary, a tenant has an unrestricted right to assign or sublet at will. *Eten v. Luyster,* 60 N.Y. 252, 257 (1875); *Mann Theatres Corp. of California v. Mid–Island Shopping Plaza, Inc.,* 94 A.D.2d 466, 470, 464 N.Y.S.2d 793, 797 (2d Dep't 1983), *aff'd,* 62 N.Y.S.2d 930, 479 N.Y.S.2d 213, 468 N.E.2d 51 (1984); *Fleisch v. Schnaier,* 119 A.D. 815, 815, 104 N.Y.S. 921, 921 (1st Dep't 1907); *Kruger v. Page Mgt. Co.,* 105 Misc.2d 14, 19, 432 N.Y.S.2d 295, 299 (Sup.Ct. Special Term N.Y. County 1980); *American Book Co. v. Yeshiva Univ. Dev. Found., Inc.,* 59 Misc.2d 31, 33, 297 N.Y.S.2d 156, 159 (Sup.Ct. N.Y. County 1969). Moreover, "provisions or covenants in · a lease restricting assignment or subletting are 'restraints which courts do not favor. They are construed with the utmost jealousy, and very easy modes have always been countenanced for defeating them.' " *Kruger,* 105 Misc.2d 14, 19, 432 N.Y.S.2d 295, 300 (quoting *Riggs v. Pursell,* 66 N.Y. 193, 201 (1876));

*Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 831, 385 N.E.2d 566, 570 (1978) (same); *Presby v. Benjamin*, 169 N.Y. 377, 380, 62 N.E. 430, 431 (1902) (same); *see* 74 NY Jur.2d *Landlord & Tenant* § 671 (1988).

■ Although there is no dispute that paragraph 11 in Lease I, titled "Assignment and Subletting" was stricken from the lease, the parties disagree as to the resultant consequences. Debtors' erroneously contend that the excision of that clause rendered the subject leasehold inalienable. However, the clause excised from Lease I, which allowed the assigning or subletting of the Premises, was not replaced with express anti-assignment or anti-sublet language. It was simply crossed out and the Debtors now endeavor to have this Court imply, into Lease I, a covenant restricting its assignment or sublease. For the reasons discussed below, this Court declines to do so.

   b. *Implied Covenants Against Assignment/Sublet*

■ It is generally recognized that "[i]mplied covenants are disfavored." *Net Realty Holding Trust v. King's Mammoth Inc. (In re KDT Industr., Inc.)*, 30 B.R. 252, 254 (Bankr.S.D.N.Y.1983). Moreover, because they are strictly construed even if expressly stated, an implied covenant restraining the alienation of a leasehold interest:

   is to be recognized only if it is clear that a reasonable landlord would not have entered into the lease without such an understanding, for it is only in such a situation that it can be said with the requisite certainty that to refuse to recognize such a covenant would be to deprive the landlord of the fruits of his bargain.

*Rowe*, 46 N.Y.2d at 70, 412 N.Y.S.2d at 831, 385 N.E.2d at 570.

Debtors, by asserting the existence of an implied covenant against assignment or sublet in Lease I, bear the burden of proving:

not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole. This is especially so where, as here, the implied covenant sought to be recognized and enforced is of a type not favored by the courts.

*Id.*, 46 N.Y.2d at 69, 412 N.Y.S.2d at 831, 385 N.E.2d at 570.

■ It is the court's function to enforce the terms of Lease I as it was agreed to by the parties, not rewrite it. *Id.* Looking at the facts of the instant matter, it is apparent that the Debtors have not met this heavy burden. Their bald contention that the stricken clause demonstrates the signatories' intent that Lease I not be assignable is an insufficient demonstration to this Court that a covenant against assignment was "implicit in [Lease I] viewed as a whole." *Id.* In fact, at the time Debtors purchased the Premises in March of 1988, it was already encumbered by both Lease I and Lease II. Further, subsequent to the conveyance and during the term of the sublet to Getty, Sok himself as tenant renewed Lease II with Getty. Thus, this Court's refusal to recognize an implied covenant against assignment or subletting clearly does not deprive Sok in his capacity as co-debtor landlord, "of the fruits of his bargain" and he may not now contend that such a covenant was "implicit in [Lease I] viewed as a whole." *Id.*, 46 N.Y.2d at 69–70, 412 N.Y.S.2d 827, 385 N.E.2d 566.

   c. *Waiver*

■ Moreover, even if this Court were to accept the Debtors' contention that the striking of Paragraph 11 from Lease I rendered the leasehold inalienable, their argument would still fail because any right they would have had to terminate the lease because of the purported breach was waived by the Debtors' continued and systematic acceptance of the rent due under Lease I.[7] *At-*

---

7. Debtors claim that they "have only accepted rent from the parties hereto under order of the court," and further, that after the June rent, they "have refused even the offer of July rent pending a determination of this motion." *See* Debtors'

Reply Affidavit, dated July 22, 1993, at 5–6. However, Getty states that it "has consistently paid its monthly rent to the [D]ebtors to date and the [D]ebtors have never rejected any of the rent payments." *See* Affirmation of A. Jeffrey Spiro,

*kin's Waste Materials, Inc. v. May,* 34 N.Y.2d 422, 427, 358 N.Y.S.2d 129, 132, 314 N.E.2d 871 (1974); *Brentsun Realty Corp. v. D'Urso Supermarkets, Inc.,* 182 A.D.2d 604, 582 N.Y.S.2d 216, 218 (2d Dep't 1992) (accepting rent waived purported breach of non-assignment provision in lease); *Witkoff v. Shopwell, Inc.,* 112 A.D.2d 295, 296, 491 N.Y.S.2d 740, 742 (2d Dep't 1985) (accepting rent without protest despite lease violations waives right to terminate).

■ Under New York law, "[t]he power to terminate a continuing contract because of a particular breach of that contract is a power of election." *Apex Pool Equip. Corp. v. Lee,* 419 F.2d 556, 562 (2d Cir.1969). When a contract is breached during its term, the non-breaching party " 'has a choice presented to him of continuing the contract or of refusing to go on.' " *Id.* (quoting *Emigrant Industr. Savs. Bank v. Willow Builders, Inc.,* 290 N.Y. 133, 145, 48 N.E.2d 293, 299 (1943)); *see In re RLR Celestial Homes, Inc.,* 108 B.R. 36, 45 (Bankr.S.D.N.Y.1989). Further, when the " 'injured party chooses to go on, he loses his right to terminate the contract because of the default.' " *Apex Pool Equip.,* 419 F.2d at 562.

In the instant case, from the time of the conveyance of the Premises in March of 1988, through at least June of 1993, Debtors have been paid, and have continued to accept, the rent due pursuant to Lease I. Thus, they did not exercise their option based upon the purported breach of Lease I to treat their obligations as discharged. *See In re RLR Celestial Homes, Inc.,* 108 B.R. 36, 45 (Bankr.S.D.N.Y.1989). Further, not only have the Debtors continued to accept payment with full knowledge of the alleged default, but in addition, there is no evidence before this Court of any objections on their part, prior to this action, that they considered the sublease between Power Test and Getty a breach of Lease I. *See In re City*

*Stores, Co.,* 9 B.R. 717, 721–22 (Bankr. S.D.N.Y.1981).

■ "Where a lease has been assigned in violation of a restriction prohibiting such assignment, acceptance of rent by the paramount landlord from the assignee, with full knowledge of the assignment, constitutes a waiver of the breach." 74 NY Jur. *Landlord and Tenant* § 673 (1988); 49 Am.Jur.2d *Landlord and Tenant* § 421 (1970). Although in the instant case it appears that Power Test, utilizing funds provided by Getty, continued to make the rent payments due under Lease I,[8] Debtors purchased the Premises already encumbered by both leases, and Sok himself renewed Lease II *with Getty during the term of the sublease between Power Test and Getty.* Thus Debtors had notice that the Premises were occupied by Getty, "and thereby were put upon inquiry with respect to the authority of the tenant so to sublet." *Fischer v. Ginzburg,* 191 A.D. 418, 181 N.Y.S. 516, 519 (1st Dep't 1920). Had Debtors made such an inquiry, they would have discovered then, if they had not before, that the clause concerning assignment and subleasing was stricken from Lease I and could have raised objections to the arrangement at that time. *See id.* However, it appears they did not.

Thus, in light of all of the foregoing, Debtors waived any right to forfeiture of Getty's leasehold interest they would have had based upon the purported prepetition breach of Lease I. *See Acme Precision Bldg., Ltd. v. Dayton Forging & Heat Treating, Inc. (In re Acme Precision Bldg., Ltd.),* 23 B.R. 79, 84 (Bankr.S.D. Ohio 1982).

*B. Exercise of Second Option to Renew*

■ With regard to the Debtors' argument that the second renewal option was not exercised properly, Getty contends that the provisions of Lease I with respect to its

dated July 20, 1993, at 7; Affidavit of Samuel M. Jones, dated July 16, 1993, at 3.

This Court notes that no order was signed in this matter directing Debtors to accept the rent due under Lease I. Further, although there are conflicting statements with respect to the refusal of July's rent, even if the Debtors refused the July rent and continued such refusal after the June

1993 payment, it appears that they accepted rental payments from March of 1988, when the Premises were conveyed through at least June of 1993, a period in excess of five years.

**8.** Affidavit of Samuel M. Jones, Vice President and General Counsel of Getty, dated July 16, 1993, at ¶ 4.

renewal were satisfied.[9] In support of its position, Getty produced copies of two letters sent by Power Test to the Debtors informing them of Power Test's intent to exercise the second option to renew. The first letter, dated October 18, 1991, was sent to the Debtors via certified mail, return receipt requested.[10] It was returned unclaimed.[11] This letter, then dated November 12, 1991, was re-sent to the Debtors via regular United States mail. Debtors acknowledge rejecting the certified letter and claim that by such action they "clearly and convincingly refused to renew the subject lease." Debtors' Reply Affidavit, dated July 22, 1993, at 5. However, this Court notes that despite a provision in Lease I providing that "Notices from Landlord to Tenant shall be sufficient if posted in the United States mails, postage prepaid, addressed to the Tenant's place of business,"[12] it appears that at no time did the Debtors take affirmative action to notify Getty or Power Test of their refusal to renew Lease I. In fact, as discussed above, Debtors apparently continued to accept the rental payments due under the lease through at least the June 1993 payment. Thus, this Court in recognizing the second renewal, is unpersuaded by the Debtors' arguments that the second renewal option was not exercised properly and that the unclaimed return receipt requested delivery constituted an effective refusal of Power Test's renewal.

## C. Rejection of Lease I

Because Debtors waived any right to forfeiture of Getty's leasehold interest they would have had based upon the purported prepetition breach of Lease I, such lease was not terminated prepetition, and the analysis now turns to the Debtors' attempted rejection.

The Debtors' unexpired leases may, with court approval, be assumed or rejected by them. 11 U.S.C. §§ 365(a) & 1107(a). When considering a request to assume or reject an unexpired lease, courts generally apply the business judgment rule. *Control Data Corp. v. Zelman (In re Minges )*, 602 F.2d 38, 43 (2d Cir.1979); *In re Child World*, 142 B.R. 87, 89 (Bankr.S.D.N.Y.1992); *In re Stable Mews Assocs., Inc.*, 41 B.R. 594, 596 (Bankr.S.D.N.Y.1984); *In re Shangri–La Nursing Ctr., Inc.*, 31 B.R. 367, 372 (Bankr. E.D.N.Y.1983). In examining an attempted rejection of an unexpired lease pursuant to 11 U.S.C. § 365(a):

> the issue is of course first presented for judicial determination when a debtor, having decided that rejection will be beneficial within contemplation of § 365(a), moves for approval of the rejection. The issue thereby presented for first instance judicial determination by the bankruptcy court is whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.

*Lubrizol Enterpr., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir.1985), *cert. denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

In the instant case, Debtors are the lessors under Lease I, and even though "leases are generally treated as executory contracts, ... they raise some unique considerations, particularly in the relatively rare instance where it is a debtor landlord who seeks to reject the lease." *In re Minges*, 602 F.2d 38, 41 (2d Cir.1979). This Court has previously noted that " '[p]roblems concerning the rejection of unexpired leases of real property when the debtor is the lessor rather than the lessee are infrequently litigated....' " *In re Lee*

---

9. These provisions enable the tenant to exercise the option to extend Lease I for two consecutive five-year periods by notifying the landlord in writing. Under Lease I, such notice was to be at least ninety days prior to the expiration of the preceding term and would be deemed sufficient if delivered to the landlord, sent by telegraph, or placed in the United States mails, postage prepaid, addressed to the landlord.

10. This letter substantially conformed to the letter dated December 29, 1986, sent by Power Test to Norman A. Fieber and Sylvia Fieber, the then landlords, exercising the first renewal option.

11. Getty has produced copies of the Certified Mail Receipt dated October 21, 1991, and the unclaimed envelope stamped "Final Notice," dated November 5, 1991.

12. ¶ 16 Lease I.

*Road Partners, Ltd.,* 155 B.R. 55, 58 (Bankr. E.D.N.Y.1993) (quoting *Collier,* ¶ 365.09, at 365–57). The scant authority construing a debtor-lessor's rejection of an unexpired lease has been attributed to the "fact that the bankruptcy or reorganization of a lessor will not ordinarily disturb existing leases, since the lessor's interest and the rents accruing thereon will be administered as definite assets of the estate." *Collier,* ¶ 365.09, at 365–57. However, in the instant case, Debtors are in a somewhat unique situation. They are lessors of the Premises under Lease I, pursuant to which, they are entitled to $925.00 per month rent, while Sok simultaneously is the sublessee of the subleased Premises under Lease II, pursuant to which, he owes Getty as sublessor a minimum base rent of $4,000.00 plus various additional charges including a gallonage purchase requirement. Thus, it is clear to this Court that the Debtors' contention that Lease I was breached prepetition and their attempted rejection of such lease is no more than a thinly veiled effort to terminate Getty's leasehold interest and thereby 'disturb' these leases.[13] *See In re Carlton Restaurant, Inc.,* 151 B.R. 353, 355 (Bankr.E.D.Pa.1993).

▮▮▮ A lease is part contract and part conveyance. *In re Arden and Howe Assocs., Ltd.,* 152 B.R. 971, 974 (Bankr.E.D.Ca.1993). It creates an estate in the subject property, which vests in the lessee. *See id.* Where the debtor is the lessor under an unexpired lease of real property, rejection of that lease only results in the termination of covenants that require future performance by the debt-

or. *LHD Realty Corp. v. Metropolitan Life Ins. Co. (In re LHD Realty Corp.),* 20 B.R. 717, 719 (Bankr.S.D.Ind.1982). Rejection does not divest the lessee of its estate. *Id.* (quoting *Collier,* ¶ 365.09, at 365–58); *Solon Automated Servs. v. Wood Comm Fund I, Inc., (In re Wood Comm Fund I, Inc.),* 116 B.R. 817, 818 (Bankr.N.D.Ok.1990) (lessee's leasehold not diminished, changed, or modified because of bankruptcy). Under the Bankruptcy Code, when a debtor-lessor rejects an unexpired lease, the lessee has the option to either consider the lease terminated or may stay in possession of the property for the balance of the current term and exercise any right to extension or renewal. 11 U.S.C. § 365(h)(1);[14] *In re Arden and Howe Assocs., Ltd.,* 152 B.R. 971, 973–74 (Bankr. E.D.Ca.1993); *In re Harborview Dev. 1986 Ltd. Partnership,* 152 B.R. 897, 900–01 (D.S.C.1993); *In re Carlton Restaurant, Inc.,* 151 B.R. 353, 355–56 (E.D.Pa.1993); *Solon Automated Servs., Inc. v. Georgetown of Kettering, Ltd. (In re Georgetown of Kettering, Ltd.),* 22 B.R. 312, 315–16 (Bankr.S.D.Ohio 1982). Section 365(h)(1) provides in pertinent part:

> If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, . . . the lessee . . . may treat such lease . . . as terminated by such rejection . . . or . . . may remain in possession of the leasehold . . . under any lease . . . the term of which has commenced for the balance of such term and for any renewal or extension of such term

---

**13.** Although the Debtors moving papers fail to specifically address Lease II, it appears to this Court that they are attempting to also terminate Lease II by terminating Getty's leasehold interest in the Premises pursuant to Lease I. Paragraph 18 of Lease II provides in pertinent part that Lease II "is subject and subordinate to all ground and underlying leases . . . which may now or hereinafter affect this lease or the Station, and to all renewals, modifications, consolidations, replacements and extensions thereof." And this Court recognizes that under New York law, "a sublease which is subject and subordinate to a prime lease is automatically terminated if the prime lease itself is validly terminated." *In re Shoppers Paradise, Inc.,* 8 B.R. 271, 275 (Bankr.S.D.N.Y.1980).

**14.** Section 365(h) specifically provides that when a debtor-landlord rejects a lease, the tenant may

treat the lease as terminated if so permitted by the lease, applicable non-bankruptcy law, and agreements the tenant may have with third parties or may remain in possession of the leasehold, "the term of which has commenced" with the right to deduct from the rent the cost of performing any of the landlord's defaulted obligations. 11 U.S.C. § 365(h)(1) & (2). Other than this offset, the tenant is not entitled to damages for future non-performance by the landlord. 11 U.S.C. § 365(i)(2)(B); *In re Acme,* 23 B.R. 79, 84 (Bankr.S.D.Ohio 1982). Thus, if the lessee elects to remain in possession, any damages occurring after the date of rejection as a result of the landlord-debtor's defaulted obligations under the lease, may be offset against the lessee's postpetition rent. 11 U.S.C. § 365(h)(2).

that is enforceable by such lessee ... under applicable nonbankruptcy law.

11 U.S.C. § 365(h)(1).

"It is clear that Congress' intent was to afford the debtor the benefit of rejecting an undesirable lease while at the same time protecting the property rights of the lessee." *In re LHD Realty Corp.*, 20 B.R. at 719 (citing H.R. No. 95–595, 95th Cong., 2d Sess. (1977) 349; S.R. No. 95–989, 95th Cong., 2d Sess. (1978) 60; U.S.Code Cong. & Admin.News 1978, pp. 5787). Thus, a tenant may elect to maintain its estate, "which will include all enforceable renewal terms that the tenant may insist upon unilaterally," [15] and the Debtors cannot deprive the lessee of its possessory property interest in the Premises. *Upland/Euclid, Ltd. v. Grace Restaurant Co. (In re Upland/Euclid, Ltd.)*, 56 B.R. 250 (Bankr. 9th Cir.1985); *Chestnut Ridge Plaza Assocs., L.P. v. Fox Grocery Co. (In re Chestnut Ridge Plaza Assocs., L.P.)*, 156 B.R. 477, 481 (Bankr.W.D.Pa.1993); *In re Arden and Howe Assocs., Ltd*, 152 B.R. at 974–75; *In re Wood Comm Fund I, Inc.*, 116 B.R. at 818; *In re Stable Mews Assocs., Inc.*, 41 B.R. 594, 599 (Bankr.S.D.N.Y.1984); Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection'*, 59 U.Colo.L.Rev. 845, 905 (1988) ("nothing about rejection of the lease asset in the lessor's bankruptcy terminates the lessee's right to possession of the underlying asset"). "The obligations under the lease and rights associated with the tenant's leasehold interest do not just vanish because a debtor has rejected the lease. The leasehold interest remains intact and the lease remains operative between the parties." *In re Chestnut Ridge Plaza Assocs., L.P.*, 156 B.R. 477 at 485 (Bankr.W.D.Pa.1993). The parties' substantive rights are not altered. *Id.* at 483; *Home Express, Inc. v. Arden & Howe Assocs., Ltd. (In re Arden & Howe Assocs., Ltd.)*, 1993 WL 129784 at *4 (E.D.Ca.1993).

■ The business judgment standard, as discussed above, requires only a demonstration that rejection of the executory contract or unexpired lease will benefit the estate. *In re Stable Mews Assocs., Inc.*, 41 B.R. 594, 596 (Bankr.S.D.N.Y.1984) (citing *In re Minges*, 602 F.2d 38, 43 (2d Cir.1979)). Central to this showing "is the extent to which a rejection will benefit the general unsecured creditors of the estate." *Id.*

■ In the instant case, the Debtors have not presented convincing evidence to this Court that rejecting Lease I will benefit the Debtors' estate. Although they conclude "that should the lease agreements be deemed proper and maintainable by this Court, then the Debtors' estate will be rendered practically insolvent as the burden of such lease agreements may very well be insurmountable," [16] they utterly fail to address much less demonstrate to this Court how the estate would be benefitted through the rejection of Lease I or further, how such rejection, if allowed, would relieve the estate any burdens. In fact, even if this Court allowed Debtors to reject Lease I pursuant to section 365(a), a point, which this Court does not concede, Getty's "leasehold interest would remain intact post-rejection," and Getty could remain in possession of the leasehold for the balance of the term pursuant to section 365(h)(1). 11 U.S.C. § 365(h)(1); *In re Chestnut Ridge Plaza Assocs., L.P.*, 156 B.R. 477 at 481; *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr.S.D.N.Y.1992). Thus, there is no credible justification "for a finding that 'there is a reasonable likelihood that general creditors will derive a substantial or significant benefit from the proposed lease rejection.'" *Friarton Estates Corp. v. City of New York (In re Friarton Estates, Corp.)*, 65 B.R. 586, 594 (Bankr.S.D.N.Y.1986) (quoting *In re Minges*, 602 F.2d 38, 44 (2d Cir.1979)).

In sum, this Court is once again faced with a debtor-lessor's attempt to use rejection as "simply a tool" with which the debtor hopes to terminate a lessee-sublessor's interest in the [P]remises and "gain for itself the higher rents" charged pursuant to the sublease. *In re Lee Road Partners, Ltd.*, 155 B.R. 55, 64 (Bankr.E.D.N.Y.1993). However, because Getty's "leasehold interest remains intact under § 365(h), rejection of the lease does not

---

**15.** *Collier,* ¶ 365.09, at 365–60.

**16.** Debtors' Notice of Cross Motion, dated June 30, 1993, at 5–6.

appear to be in the best interests of the estate," and the Debtors' cross-motion to reject Lease I is, therefore, denied. *In re Lee Road Partners, Ltd.*, 155 B.R. 55, 64 (Bankr. E.D.N.Y.1993); *In re Friarton Estates, Corp.*, 65 B.R. at 594.

### D. Getty's Claim for Rents, Costs, Expenses, and Attorney's Fees

██ In the landlord and tenant action in the Civil Court previously referred to, in a decision dated December 7, 1993, the court found that Getty is entitled to recover from Sok the amount of $67,876.98 for rent and additional rent due pursuant to Lease II for the period from March 17, 1993 to November 30, 1993, less $8,443.52 held by Getty as security, and $10,000.00 as reasonable attorney's fees, together with costs and disbursements. Getty's motion insofar as it seeks payment of the foregoing is granted to the extent set forth below.

Debtors filed for relief under the Bankruptcy Code on April 5, 1993. Of the $67,876.98 found due by the State Court, this Court notes that the same included rents for the prepetition period from March 17, 1993 to April 4, 1993, for a total of 19 days, and that the balance of rents due to November 30, 1993 covers postpetition rents due. Thus, as appears from the above, Getty is allowed a general unsecured claim incurred by Sok for the aforesaid prepetition period of 19 days plus $10,000.00 for attorney's fees together with costs and disbursements as set by the State Court, less $8,443.52 held by Getty as security.

As set forth above, the State Court's judgment included a balance for postpetition rent for the period from April 5, 1993 to November 30, 1993, for which Getty is entitled to an administration expense claim. This Court has been advised by the attorneys for Getty that Sok has failed to pay postpetition rent to date, even after November 30, 1993. Thus, in addition to the above mentioned administration expense claim, Getty is also allowed an administration expense claim for the unpaid postpetition rents accruing after November 30, 1993.

Getty is permitted to file claims in this case in accordance with the foregoing.

### E. Effect of Rejection of Lease II

██ This Court has been informed that the Sok continues in possession of the Premises notwithstanding his failure to assume Lease II. The Bankruptcy Code provides that:

[t]he trustee [or debtor-in-possession] *shall timely perform all the obligations of the debtor,* ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected....

*if the trustee [or debtor-in-possession] does not assume or reject* an unexpired lease of nonresidential real property under which the debtor is the lessee *within 60 days after the date of the order for relief,* or within such additional time as the court, for cause, within such 60–day period, fixes, then *such lease is deemed rejected and the trustee [or debtor-in-possession] shall immediately surrender such nonresidential real property to the lessor.*

11 U.S.C. § 365(d)(3) & (4) (emphasis added).

[W]here no order assuming lease, rejecting lease, or extending time for entry of such order was entered within 60 days, time for assumption of lease expired, and by operation of law any possessory interest which debtor had in lease terminated and any right which lessor had to immediate surrender of property simultaneously accrued....

*Anderson v. Elm Inn Inc. (In re Elm Inn, Inc.)*, 942 F.2d 630, 631, 633 (9th Cir.1991). "Some courts have held that the deemed rejection of a lease under section 365(d)(4) 'merely places the creditor[-lessor] in a position to pursue remedies under the state law of landlord and tenant to obtain possession of the premises.'" *Id.* at 634 (quoting *In re Adams*, 65 B.R. 646, 649 (Bankr.E.D.Pa. 1986)). However, the great weight of authority "and far more persuasive view," is that the bankruptcy court can issue an order granting the surrender of the leased property to the lessor once the time for assumption or rejection of the unexpired lease has passed and the lease is deemed rejected. *Id.; see, e.g., In re U.S. Fax, Inc.*, 114 B.R.

70, 73 (E.D.Pa.1990) (lessor entitled to immediate surrender once lease deemed rejected); *In re Flexipak, Inc.*, 49 B.R. 641, 642–43 (S.D.N.Y.1985) (same); *In re 6177 Realty Assocs., Inc.*, 142 B.R. 1017, 1020 (Bankr. S.D.Fla.1992) (same); *In re Chris–Kay Foods East, Inc.*, 118 B.R. 70, 72 (Bankr. E.D.Mich.1990) (same); *In re Damianopoulos*, 93 B.R. 3, 8 (Bankr.N.D.N.Y.1988) (same); *In re Giles Assocs., Ltd.*, 92 B.R. 695, 696 (Bankr.W.D.Tex.1988) (same); *Blue Diamond Meat Co. v. Grant Food Prods. Inc. (In re Grant Food Prods., Inc.)*, 87 B.R. 6, 8 (Bankr.D.Del.1988) (same); *In re Dial–A–Tire, Inc.*, 78 B.R. 13, 16 (Bankr.W.D.N.Y. 1987) (same); *In re O.P. Held, Inc.*, 77 B.R. 388, 391 (Bankr.N.D.N.Y.1987) (same); *In re Criadores De Yabucoa, Inc.*, 75 B.R. 96, 97 (Bankr.D.P.R.1987) (same); *Ridgeview Lincoln–Mercury, Inc. v. Hurst Lincoln–Mercury, Inc. (In re Hurst Lincoln–Mercury, Inc.)*, 70 B.R. 815, 817 (Bankr.S.D.Ohio 1987) (same); *In re Bernard*, 69 B.R. 13, 14–15 (Bankr.D.Haw.1986) (same); *In re Burns Fabricating Co.*, 61 B.R. 955, 956–57 (Bankr. E.D.Mich.1986) (same). The Ninth Circuit in analyzing section 365(d)(4) and applicable case law stated:

> [a]s these courts have noted, the plain language and purpose of section 365(d)(4), the necessarily preemptive force of the Bankruptcy Code, and the broad equitable powers of bankruptcy judges all weigh in favor of granting a surrender order to a lessor who, under the terms of the provision, clearly deserves one.

*In re Elm Inn, Inc.*, 942 F.2d at 634 (citing 11 U.S.C. § 105(a)).

The language of section 365(d)(4) is unambiguous and the relevant case law is clear. Because Sok has not specifically assumed or rejected Lease II within 60 days of the order for relief, Lease II is deemed rejected and Sok is directed to surrender the Premises to Getty within 10 days of this Court's signing of an order consistent with this opinion. In the event that Sok fails to surrender the Premises as required, Getty may seek to recover possession unimpaired by section 362(a).

## III. CONCLUSION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and it is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(A), (G), and (O).

2. Lease I was not breached prepetition by Power Test's sublease to Getty.

3. Debtors waived any right to forfeiture of Getty's leasehold interest they would have had based upon the purported prepetition breach of Lease I.

4. Power Test properly exercised its second option to renew Lease I.

5. Debtors' Rejection of Lease I is not in the best interests of the estate.

6. Getty's leasehold interest in the Premises remains intact pursuant to section 365(h).

7. Lease II is deemed rejected pursuant to section 365(d)(4).

8. Sok shall surrender possession of the Premises to Getty, as prescribed by section 365(d)(4) within 10 days of this Court's signing of an order consistent with this opinion.

9. In the event that Sok fails to surrender the Premises as required, Getty may seek to recover possession unimpaired by section 362(a).

SUBMIT AN ORDER CONSISTENT WITH THIS OPINION.